BANCO NACIONAL DE CUBA,
Plaintiff,

v.

CHEMICAL BANK NEW YORK
TRUST CO., Defendant.

BANCO NACIONAL DE CUBA,
Plaintiff,

v.

MANUFACTURERS TRUST
CO., Defendant.

BANCO NACIONAL de CUBA, Plaintiff,

v.

IRVING TRUST CO., Defendant.

Nos. 61 Civ. 0485–CLB, 61 Civ. 0569–
CLB and 61 Civ. 1846–CLB.

United States District Court,
S.D. New York.

Oct. 16, 1984.

Michael Krinsky, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for plaintiff.

Henry Landau, Simpson, Thatcher & Bartlett, New York City, for defendant Mfrs. Trust Co.

David Keyko, Winthrop, Stimson, Putnam & Roberts, New York City, for defendant Irving Trust Co.

Richard B. Lind, Gersten, Savage & Kaplowitz, New York City, for defendant Chemical Bank New York Trust Co.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Pursuant to Rule 56, F.R.Civ.P., plaintiff moves for an order granting summary judgment in its favor on both its claims against the three defendant banks and on the counterclaims asserted by each of the defendants.

These three actions, not consolidated but being litigated together, arise from events connected with the Cuban Revolution of 1959. Familiarity with this Court's opinion in *Banco Nacional de Cuba v. Chase Manhattan Bank,* 505 F.Supp. 412 (S.D.N.Y. 1980), *aff'd as modified,* 658 F.2d 875 (2d Cir.1981), and the cases cited in the margin, all of which describe the social, political and economic changes that took place in Cuba subsequent to the Revolution, is assumed.[1]

The present litigation was instituted by plaintiff Banco Nacional de Cuba, in its own right, and as successor in interest of certain private Cuban banks, to recover amounts deposited in New York with defendants Chemical Bank New York Trust Company ("Chemical Bank"), Manufacturers Trust Company ("Manufacturers") and Irving Trust Company ("Irving").[2] Defendants counterclaimed, asserting a right to set off losses they incurred as a result of the expropriation by Cuba of Cuban Electric, a corporation indebted to the defendants on loans totalling over Two Million Dollars.[3]

Each of these cases was assigned for all purposes to the Honorable Frederick vanPelt Bryan. They were subsequently tried without a jury before Judge Bryan, who died on April 17, 1978 before rendering a decision. Thereafter, the actions were reassigned to me. The parties stipulated and agreed through counsel that the Court might render a decision based upon the proceedings and papers before the late Judge Bryan without reopening the trial record or accepting additional proof.

On January 12, 1980, this Court, in an unpublished opinion, rendered partial summary judgment in favor of the defendant

---

1. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 193 F.Supp. 375 (S.D.N.Y.1961), *aff'd,* 307 F.2d 845 (2d Cir.1962), *rev'd,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), *on remand sub nom. Banco Nacional de Cuba v. Farr,* 243 F.Supp. 957 (S.D.N.Y.), 272 F.Supp. 836 (S.D.N.Y.1965), *aff'd,* 383 F.2d 166 (2d Cir.1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968); *Banco Nacional de Cuba v. First National City Bank,* 270 F.Supp. 1004 (S.D.N.Y.1967), *rev'd,* 431 F.2d 394 (2d Cir.1970), *vacated and remanded,* 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), *on remand,* 442 F.2d 530 (2d Cir.1971), *rev'd,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), *on remand,* 478 F.2d 191 (2d Cir.1973); *Banco Para el Comercio Exterior de Cuba v. First National City Bank,* 658 F.2d 913 (2d Cir.1981), *rev'g in part sub nom. Banco Nacional de Cuba v. Chase Manhattan Bank,* 505 F.Supp. 412 (S.D.N.Y.1980), *rev'd,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983).

2. The prior Court of Appeals panel opinion in these cases specifically held that Banco Nacional was entitled to recover funds it had deposited in its own behalf without any set-off. It may well be that the validity of this holding does not survive the intervening decision of the Supreme Court in *Bancec.* If so, since this litigation has not yet been concluded, it would seem appropriate to apply to the Court of Appeals to modify or recall the mandate in regard to this point. At present those claims are not before this Court. See *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.,* 658 F.2d 903, 910 (2d Cir.1981).

3. The amounts due defendants on the loans at the time of the expropriation were as follows: Chemical Bank, $750,000; Irving, $750,000; and Manufacturers, $1,000,000.

banks, holding that Banco Nacional de Cuba had not acquired choses in action of the private banks located in New York, and thus could not assert the claims pleaded in the complaint on their behalf. *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, Dkt. No. 61 Civ. 0485–CLB (S.D.N.Y. January 4, 1980). On appeal, the Court of Appeals for the Second Circuit reversed. *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903 (2d Cir.1981). That Court remanded the three actions to this Court solely for consideration of the defendants' counterclaims for set-off which, due to the earlier dismissal of the primary claims, had been dismissed as moot. Inasmuch as each of the present motions for summary judgment involves identical issues of law, they will be addressed collectively.

## I

On October 13, 1960, the Government of Cuba enacted Law No. 891, which nationalized substantially all of that nation's private banks. The law declared that the expropriation would be carried out through Banco Nacional de Cuba as "the legal successor, substitute[d] in lieu and stead of the [private banks]", and also reorganized Banco Nacional, which had previously been a private concern, making it a constituent part of the Government of Cuba "in charge of the banking function of the state." Thus, as this Court has found, *see Chemical Bank, supra*, slip op. at 3, under Law No. 891 Banco Nacional, in succeeding the private banks, effectively became the *alter ego* of the Government of Cuba. *Accord, Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903, 910 (2d Cir.1981) ("with respect to Banco Nacional's claim as successor to the Private Banks ... Banco Nacional must be viewed as pursuing those claims on behalf of the Cuban government."); *Banco Nacional de Cuba v. First National City Bank of New York*, 478 F.2d 191, 193 (2d Cir.1973); *see also, First National City Bank v. Banco*

*Para el Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 2603, 77 L.Ed.2d 46 (1983) ("Cuba cannot escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities.").

At the time of the expropriation several of the private banks had substantial sums on deposit in New York in various accounts with the defendants.[4] When Banco Nacional, as successor to the private banks, demanded payment of the funds, the defendants refused. This litigation was commenced by Banco Nacional to recover those deposits.

Defendants claim the right to set off the deposits against their own claims against Cuba for expropriation of the debts owed them in Cuba by the Cuban Electric Company. Two months prior to the nationalization of the private banks and on August 6, 1960, Cuban Electric, a public utility controlled in Cuba by American nationals, was expropriated by Resolution No. 1 of Law No. 851, along with other American-owned enterprises located in the Republic of Cuba. This was done by the Cuban government in retaliation for conduct of the American government in making adjustments to the import quota for sugar, as described in this Court's opinion in *Banco Nacional de Cuba v. Chase Manhattan Bank*, 505 F.Supp. 412, 420 (S.D.N.Y.1980), *aff'd*, 658 F.2d 875 (2d Cir.1981). Thus, defendants charge, the Government of Cuba became the successor in interest of the Cuban Electric Company as a going concern, and assumed its assets, properties and liabilities (Memorandum of Defendants at 14–15), all of which comprised the capital of the company. In effect the debts too, which had their situs in Cuba, were also expropriated. *See infra*, n. 6 and accompanying text. The amounts due, however, on the debts of Cuban Electric Company to defendants were never paid. Each of the defendants counterclaims solely for the amount of the

---

**4.** The total amounts deposited by the private banks with each of the defendants were as follows: Chemical Bank, $238,368; Irving, $58,460; and Manufacturers, $428,639. Since the counterclaims seek no affirmative relief, the maximum amounts recoverable are limited to the amounts deposited with each individual defendant.

set-off and not for any sums in excess of the amounts claimed by Banco Nacional.

The questions of whether Banco Nacional is the owner of the New York deposits of the private banks and whether it has a right to assert against the defendants its claims to those deposits, have been answered in the affirmative by the United States Court of Appeals for the Second Circuit. *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903, 909 (2d Cir.1981). The question now before this Court is: May this Court also entertain the defensive counterclaims asserted by the defendants as set-offs; or should the Court invoke the act of state doctrine and grant plaintiff's motion for summary judgment?

## II

Plaintiff asserts that the prior decision of the Court of Appeals in these cases, *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903 (2d Cir.1981) (hereinafter *"Chemical "*), is controlling on the motions now before this Court. In plaintiff's view, that prior panel opinion requires this Court to grant plaintiff's motions for dismissal of the defendants' counterclaims. Were it that simple, there would have been no necessity for remand. Furthermore, after the *Chemical* opinion, the Supreme Court of the United States decided *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (hereinafter "Bancec"), another case concerning the responsibility of courts to entertain cases involving the acts of foreign states.

Although in *Bancec* the Supreme Court did not expressly overrule, nor did it mention, the panel opinion in *Chemical,* this Court is nonetheless required on remand to interpret and apply the Second Circuit panel opinion in light of the intervening Supreme Court decision.

The facts of *Bancec* are strikingly congruent with the facts of the cases at bar. Respondent Bancec, seeking payment due on a letter of credit, presented the letter to Citibank. Citibank refused to honor the letter of credit, claiming a right to set off the amount concededly due thereon to Bancec against losses Citibank had incurred as a result of the expropriation by the Republic of Cuba of several Citibank branches located in Cuba. Bancec filed suit to recover the amount due on the letter of credit and Citibank asserted a defensive counterclaim or set-off for the unrecovered value of its seized branches.[5] 103 S.Ct. at 2594. At trial, Bancec had argued that it could not be held liable for the acts of the Cuban government as sovereign, since it was a separate juridical entity. This Court rejected Bancec's argument, holding that Bancec, an institution created and controlled by the Cuban government, could not avoid liability for the acts of the Government of Cuba in expropriating the Cuban branches of Citibank. Thus, finding that the unrecovered value of the expropriated Citibank branches exceeded that due on the letter of credit, this Court allowed the full value of the set-off and dismissed Bancec's complaint. On appeal, a panel of the Court of Appeals reversed, 658 F.2d 913 (2d Cir. 1981). The Court of Appeals held that Bancec was not an *alter ego* of the Cuban government, but a separate juridical entity, and therefore could not be held liable for the acts of that government. The Supreme Court reversed the Court of Appeals.

First, the Supreme Court in *Bancec* noted that Bancec had been dissolved and its operations continued by Banco Nacional de Cuba which, as was discussed earlier in this opinion, was also an instrumentality of the Government of Cuba. 103 S.Ct. at 2602. Thus, the Supreme Court in *Bancec* found that any recovery by the respondent would accrue either to Banco Nacional or the Government of Cuba. Having made this finding, the Supreme Court concluded

---

**5.** Under the act of state doctrine, a defendant, even if permitted to assert a counterclaim, is prohibited from recovering an amount in excess of the amount claimed by the foreign sovereign or its instrumentality. *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 884 (2d Cir.1981).

that it would not permit the Cuban government, as the real party in interest, to escape liability on the counterclaim by asserting the separate juridical status of the respondent under Cuban law:

> "Our decision ... is the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." 103 S.Ct. at 2603–04 (footnote omitted).

It is clear that the Supreme Court in *Bancec* sought to set forth equitable principles that were to apply in any case where a foreign sovereign sued a defendant in our Courts, and at the same time attempted to avoid a defensive counterclaim based on an expropriation which is alleged to have violated international law. That is the exact situation that has occurred in the cases at bar. The plaintiff here seeks dismissal of the counterclaims for set-off, and at the same time asks that it receive a judgment in its favor for money on deposit in New York to which it has title, indistinguishable from the letter of credit proceeds in *Bancec*. In light of the supervening *Bancec* decision, therefore, defendants herein must be permitted to set off Banco Nacional's claims against the losses they incurred as a result of the expropriation in Cuba of the debts owed them by Cuban Electric and having Cuba as a their situs.[6]

Inasmuch as the Supreme Court in *Bancec* did not address the specific act of state issues that were considered by the Second Circuit in *Chemical*, this Court will now review those pertinent decisions concerning the act of state, to determine whether a different result is warranted under the circumstances, and also to comply with those portions of the *Chemical* decision which may survive the subsequent Supreme Court decision in *Bancec*.

**6.** Although nominally an American corporation and organized under the laws of the State of Florida, substantially of Cuban Electric's assets were located in the Republic of Cuba as were all of its business activities. Once those assets were expropriated, they came under the control

## III

■ The act of state doctrine is a judicially created exception to the rule that courts of the United States will decide cases before them where their jurisdiction has been properly invoked. *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 763, 92 S.Ct. 1808, 1811, 32 L.Ed.2d 466 (1972). Historically, the doctrine was based upon the belief that courts should respect the acts of foreign sovereigns conducted within their borders. *Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). That view has since been refined and the doctrine is now cited more as a means of maintaining the proper balance "between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427–28, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). Though abstention by the courts in matters involving acts of foreign states is not required by the Constitution, the doctrine does have constitutional underpinnings, reflecting the primacy of the Executive Branch in foreign affairs. *Id.* at 423, 84 S.Ct. at 937. If this Court determines, therefore, that the act of state doctrine applies to the counterclaims asserted by the defendants, an argument may be made that we must defer to the Executive Branch, abstain from adjudicating the merits of those counterclaims and grant plaintiff's motion for summary judgment.

Relevant recent history of the act of state doctrine in the Supreme Court begins with the famous case of *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). There the Court was confronted for the first time with the issue of whether the State Department, as representative of the Executive Branch, would permit judicial consideration of the validity of transactions involving the Republic of Cuba and arising out of the

of the Cuban government. Thus, the act of state "came to complete fruition within the dominion [of Cuba]," and the debts owed the banks were expropriated within the Republic of Cuba. *See United Bank Limited v. Cosmic International, Inc.*, 542 F.2d 868 (2d Cir.1976).

post-Revolution expropriation of firms in Cuba owned or controlled by American nationals. Respondent in *Sabbatino*, an American commodities broker, contracted with C.A.V., a Cuban firm owned by American nationals, to purchase a quantity of Cuban sugar, payable in New York upon presentation of a sight draft with negotiable bills of lading attached. After the Cuban government expropriated all property and enterprises of C.A.V., including the sugar covered by the contract, the broker-purchaser, in order to obtain approval of the Cuban government for the sugar to be shipped from Cuba, entered into an agreement with Banco Para el Comercio Exterior de Cuba ("Bancec") identical to the agreement it had originally entered into with C.A.V. *Id.* at 403–05, 84 S.Ct. at 927–28. Bancec, a corporate instrumentality of the Cuban government, assigned the bills of lading to petitioner Banco Nacional de Cuba which, as already noted, was also an instrumentality of the Cuban government. When Banco Nacional, through its agent, presented the bills of lading and the sight draft as required by the agreement, the broker, indemnified by C.A.V., held onto the bills, discharged the cargo and refused to pay for the sugar. Banco Nacional then filed suit charging the broker with conversion of the sugar represented by the negotiable bills of lading. The trial court, finding the expropriation of the sugar by the Cuban government without payment to the owners violated international law, concluded that Cuba did not have good title necessary to sustain a claim for conversion. It thus entered summary judgment in favor of the broker, and the Court of Appeals for the Second Circuit affirmed. *Id.* at 406–07, 84 S.Ct. at 928–29.

The Supreme Court reversed. In so doing the Court held that the trial court had impermissibly reviewed the validity of the expropriation under international law. Instead, concluded the Court, since the expropriation was a government act performed within the borders of Cuba, the lower courts should have invoked the act of state doctrine and abstained from passing upon the expropriation issue. 376 U.S. at 430–37, 84 S.Ct. at 941–45. The summary judg-

ment dismissing Banco Nacional's conversion claim was thus vacated and the case was remanded for further proceedings. *Id.* at 439, 84 S.Ct. at 946.

The holding in *Sabbatino* is especially important in our present context for what it did not say. Although the Supreme Court ruled the absence of any affirmative statement by the Executive Branch militated against a finding that the court could review the acts of the Cuban government, it expressly left open the question of whether a court could review the acts of a foreign state when the Executive Branch "relieved" the courts by a "Bernstein letter," from any constraint upon the exercise of jurisdiction to pass upon an act of state. *Id.* at 419–20, 84 S.Ct. at 935–36.

The *Bernstein* exception to the act of state doctrine refers to the case of *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 210 F.2d 375 (2d Cir.1954). There, the Court of Appeals had held that the claims of the plaintiff to recover assets expropriated by the German government would not be dismissed on act of state grounds in light of a press release, which later became known as the "Bernstein letter", issued by the Legal Adviser of the State Department relieving " 'American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials'." 210 F.2d at 376 (citation omitted).

That issue, left open in *Sabbatino*, was next addressed by the Court in *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) ("*Citibank*"). In that case, a corporate predecessor in interest of Banco Nacional de Cuba was indebted to Citibank for a loan with an outstanding balance of $10 Million Dollars, when the Cuban government expropriated all of Citibank's Cuban branches. *Id.* at 760, 92 S.Ct. at 1810. As a measure of self-help, Citibank sold the collateral located in New York that had secured the unpaid principal and interest due on the loan and realized $1.8 Million Dollars in excess of the amount due. *Id.* at 760–61, 92 S.Ct. at 1810. Banco Nacional sue to recover the excess funds, and Citibank counterclaimed, alleg-

ing a right to set off the amounts of Banco Nacional's claim against its own losses resulting from the expropriation of its Cuban branches by the Republic of Cuba. *Id.* at 761, 92 S.Ct. at 1810.

A sharply divided Supreme Court held that the act of state doctrine did not bar Citibank's defensive counterclaim. Justice Rehnquist, writing on behalf of himself, Chief Justice Burger and Justice White, applied the *Bernstein* exception to the act of state doctrine and found that the courts could properly entertain the counterclaim. In *Citibank*, the Legal Adviser had issued a letter, the substance of which was similar to the *Bernstein* press release. It stated in part:

> " 'The Department of State believes that the act of state doctrine should not be applied to bar consideration of a defendant's counterclaim or set-off against the Government of Cuba *in this or like cases.*' " (Emphasis added). 406 U.S. at 764, 92 S.Ct. at 1811–12.

In his plurality opinion, Justice Rehnquist reviewed the history of the act of state doctrine, and found its purpose was to avoid the risk of interference by the judiciary in the conduct of foreign affairs by the President. 406 U.S. at 767, 92 S.Ct. at 1813. When, however, the Executive, acting through the State Department, expressed the view that judicial intervention would not pose a risk of frustrating the foreign policy of the United States, the reasons for invoking the doctrine were no longer present. Thus, according to the plurality opinion, a court need not abstain from hearing the counterclaims asserted by defendant Citibank, in light of issuance to it of a "Bernstein letter." Moreover, the Court emphasized that its decision was in accord with long standing principles of equity applicable to permit a counterclaim where the foreign sovereign is the party that initiates suit:

> " 'We have a foreign government invoking our law but resisting a claim against

it which fairly would curtail its recovery. It wants our law free from the claims of justice.' " 406 U.S. at 769, 92 S.Ct. at 1814 [*quoting National City Bank of New York v. Republic of China,* 348 U.S. 356, 361–62, 75 S.Ct. 423, 427, 99 L.Ed. 389 (1955) ].

In *Republic of China,* a case in which no "Bernstein letter" had issued, the Court had perceived a marked distinction between a private party haling a foreign government into a court of the United States and the situation where, as in the cases at bar, the same party merely files a defensive counterclaim or set-off after the sovereign has submitted itself to the jurisdiction of the courts by initiating a suit:

> "The point is that the ultimate thrust of the consideration of fair dealing which allows a setoff or counterclaim based on the same subject matter reaches the present situation." 348 U.S. at 365, 75 S.Ct. at 429.

Consequently, the plurality decision in *Citibank* to permit adjudication of the defendant's counterclaim rested both on the *Bernstein* exception, and at least equally on principles of equity applicable when a defensive counterclaim is pleaded, and no "Bernstein letter" is needed.

Justice Douglas, concurring in *Citibank*, criticized the plurality for reaching the *Bernstein* issue. Instead, the question of whether the counterclaim or set-off could be asserted was, according to Justice Douglas' view, controlled only by those equitable principles enunciated by the Court in *Republic of China.* 406 U.S. at 770, 92 S.Ct. at 1814. When the question arose whether to allow the counterclaims to set off the plaintiff's claim, he declared, "it would ... offend our sensibilities if Cuba could collect the amount owed on liquidation of the collateral for the loan and not be required to account for any set-off." 406 U.S. at 772, 92 S.Ct. at 1815 (Douglas, J., concurring).[7]

---

7. Justice Douglas distinguished *Citibank* from the prior *Sabbatino* decision. In his view *Sabbatino* required application of the act of state doctrine only where the defendant sought af-

firmative relief on its counterclaim. In *Citibank*, the defendant bank asserted a counterclaim solely as a defense to set off against the claim of plaintiff. Since this was clearly per-

Also concurring in *Citibank* was Justice Powell. In a tersely worded opinion he criticized the *Sabbatino* Court for purporting to require federal courts to abstain from hearing all cases before them which involve expropriation by a foreign country. Instead, he proposed a balancing approach similar to that taken by the Court in other cases:

> "Unless it appears that an exercise of jurisdiction would interfere with delicate foreign relations conducted by the political branches, I conclude that federal courts have an obligation to hear cases such as this." 406 U.S. at 775–76, 92 S.Ct. at 1817 (Powell, J., concurring).

As a result of the three opinions in *Citibank*, therefore, it became clear that the rule of abstention in cases involving an act of state "is not an inflexible one." 406 U.S. at 763, 92 S.Ct. at 1811. It also may be doubted whether the need for a "Bernstein letter" has survived.[8]

The next step in the evolution of the act of state doctrine occurred in 1981 when, on the same day, the United States Court of Appeals for the Second Circuit rendered several decisions addressing the issue of Cuba's expropriation of American-owned firms located within the Republic of Cuba. *See Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875 (2d Cir. 1981); *First National Bank of Boston v. Banco Nacional de Cuba*, 658 F.2d 895 (2d Cir.1981); *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658

---

missible, Justice Douglas never reached the issue of whether the *Bernstein* exception must be satisfied. Had he done so, however, Justice Douglas would have rejected any requirement for a "Bernstein letter": "Otherwise, the Court becomes a mere errand boy for the Executive Branch which may choose to pick some people's chestnuts from the fire, but not others." 406 U.S. at 773, 92 S.Ct. at 1816 (Douglas, J., concurring). This concurring opinion of Justice Douglas was cited with approval by a majority of the Supreme Court in *Bancec*, 103 S.Ct. at 2603, n. 25.

**8.** Congress was so justifiably irate over the result in *Sabbatino* that it enacted the *Hickenlooper* Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e)(2). In *Chase*, fn. 10 at p. 882, the Second Circuit reiterated its prior view limiting the scope of the Amendment to cases such as *Sabbatino* where expropriated Cuban property was being marketed in the United States by the Cuban intervenor. *See generally Citibank, supra*. However, a contrary view is supported by the text and legislative history of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602–1611 (1976). The FSIA set forth when and how parties will be permitted to maintain claims against a foreign state or an instrumentality thereof, and provides in part:

> "In any action brought by a foreign state ... in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—
>
> \* \* \* \* \* \*
>
> (c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state." 28 U.S.C. § 1607 (1976).

That section was enacted for one purpose; to memorialize the equitable principle enunciated in *National City Bank of New York v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955), *i.e.*, to prevent a foreign sovereign from utilizing the American courts to assert claims against American defendants, while at the same time claiming immunity from any counterclaims asserted as a set-off by those defendants.

The legislative history of the FSIA addresses the issue:

> "The committee has been advised that in some cases, after the defense of sovereign immunity has been denied or removed as an issue, the art [sic] of state doctrine may be improperly asserted in an effort to block litigation.... For example, in the Supreme Court's recent decision in [*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) ] the respondent having brought suit (and thus clearly having waived the defense of immunity) attempted to assert that a refusal to pay a commercial obligation was not reviewable because it was an 'act of state.' The committee has found it unnecessary to address the act of state doctrine in this legislation since decisions such as that in the *Dunhill* case demonstrate that our courts already have considerable guidance enabling them to reject improper assertions of the act of state doctrine." H.R. 1487, 94th Cong., 2d Sess. 20, *reprinted in* 1976 U.S.Code Cong. & Adm.News 6604, 6619.

Then, quoting from the *amicus* brief submitted by the United States in *Dunhill*, the committee report states:

> "Under the modern restrictive theory of sovereign immunity, a foreign state is not immune from suit on its commercial obligations.... To elevate the foreign state's commercial acts to the protected status of 'acts of state' would frustrate this modern development by permitting sovereign immunity to reenter through the back door, under the guise of the act of state doctrine." *Id.*

F.2d 903 (2d Cir.1981); *Banco Para el Comercio Exterior de Cuba v. First National City Bank*, 658 F.2d 913 (2d Cir. 1981), *rev'd*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). In these cases, read together, as they must be, the Court of Appeals, relying on its interpretation of the combined effect of the three majority opinions of the Supreme Court in *Citibank*, required invocation of the act of state doctrine unless the following prerequisites are met:

> "(1) the Executive Branch has provided a *Bernstein* letter advising the courts that it believes [the] act of state doctrine need not be applied, (2) there is no showing that an adjudication of the claim will interfere with delicate foreign relations, and (3) the claim against the foreign sovereign is asserted by way of counterclaim and does not exceed the value of the sovereign's claim ...." *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d at 884.

In the cases at bar it is undisputed for purposes of the present motions that the second and third prongs of the *Chase* test have been satisfied. Plaintiff has thus far made no showing that a decision on the merits of the counterclaims of the three defendant banks will in any way affect the foreign relations of the United States Government. Moreover, defendants concede that their counterclaims are asserted only defensively by way of set-off.

The central issue then, assuming the continued viability of the act of state doctrine in these cases after *Bancec*, is whether the Executive Branch has made it sufficiently clear to the courts by a statement of position in the nature of a "Bernstein letter," that it believes the act of state doctrine need not be applied to bar the defendants' counterclaims in these cases.

## IV

Plaintiff makes several arguments in favor of its motion for summary judgment dismissing the counterclaims. Plaintiff contends that just as the Court of Appeals ruled that plaintiff's claims for the deposits at issue in these cases were cognizable, so too the appeals court required this Court to abstain from hearing the merits of the counterclaims. In plaintiff's words, "[t]here being no '*Bernstein* letter' from the State Department, the counterclaims must be dismissed." (Memorandum of Plaintiff at 2). As support for its argument, plaintiff cites certain comments contained in the Second Circuit's prior opinion in these cases, *Banco Nacional de Cuba v. Chemical Bank New York Trust Co., supra*, where the Court of Appeals reversed this Court's dismissal of Banco Nacional's claims for the funds on deposit with defendants. Specifically, plaintiff directs the Court to that portion of the Second Circuit's opinion where the panel discussed whether on remand the trial court might address the merits of the counterclaims asserted by the defendant banks. In *Chemical* the appellate panel utilized the three prong test it had first set forth in *Banco Nacional de Cuba v. Chase Manhattan Bank*, ("*Chase*") *supra*. In reviewing whether the first prong of the test, namely the *Bernstein* exception, had been satisfied, the *Chemical* Court found that the record there before it was insufficient to reach any conclusion on the point. The Court of Appeals stated:

> "In the absence of a clearer record, or at least of findings as to the views of the Executive Branch, we cannot determine whether the preconditions to justiciability of the present defendants' counterclaims have been satisfied." 658 F.2d at 912.

The *Chemical* Court thus remanded to this Court for "further consideration" of the issue and concluded by saying:

> "If the district judge on remand should find that the Executive Branch has made the kind of statement necessary to support a conclusion, consistent with our ruling in [*Banco Nacional de Cuba v. Chase Manhattan Bank*], that the present counterclaims are justiciable, he will have to explore the above questions on the merits." *Chemical*, 658 F.2d at 913.

These statements can hardly be construed as a direction to dismiss the counterclaims. Nevertheless, plaintiff asserts

that, when considered together, the *Chemical* and *Chase* decisions require this Court to abstain from hearing the defendants' counterclaims on the merits. The facts of the two cases belie such a conclusion. In *Chase,* as in the present litigation, Banco Nacional de Cuba brought suit to recover sums that had been deposited in New York with an American bank. In *Chase,* as was the circumstance in *Citibank, supra,* the bank counterclaimed, seeking to set-off the plaintiff's claim against losses it had suffered as a result of the Cuban government's expropriation of Chase's Cuban branches. The *Chase* Court first formulated its test that set forth the prerequisites to avoid application of the act of state doctrine. Then, turning to the facts of that case, the Court found that all three prongs of the test had been met.

The most controversial of the three prongs in the *Chase* case was the issue of the "Bernstein letter." The appeals court, in finding that the requirement had been satisfied, looked to three communications that had been issued by the Legal Adviser to the State Department. The *Chase* court first examined the letter that had been sent to the Supreme Court in *First National City Bank v. Banco Nacional de Cuba, supra,* and found that the letter in that case not only had given that Court permission to hear the merits of Citibank's counterclaim, but also expressly granted the Executive's approval to the courts of the United States to entertain "like cases." *Chase,* 658 F.2d at 884. The second communication was a statement by the Legal Adviser in 1973 that the Executive Branch continued to hold the same views with respect to counterclaims asserted in cases that were "like" *Citibank.* Finally, the *Chase* Court accepted a 1980 letter from the Legal Adviser expressing the Department's view that the *Chase* litigation and the *Citibank* matter that had been the subject of the previous letters, " 'definitely appear[ed]' " to be " 'like' " cases. *Chase,* 658 F.2d at 884. In light of these three announcements, spanning a decade, the Second Circuit held that the counterclaim of Chase was justiciable. *Id.* at 885.

In *Chemical,* the same panel that had rendered the *Chase* decision again examined the State Department's "Bernstein letter" which had been utilized by the plurality of the Supreme Court in *Citibank* to avoid abstention on act of state grounds, and which the Second Circuit considered important in the *Chase* disposition. Turning to the facts of the three cases before it, the *Chemical* Court stated that it was "not sure" that the State Department would consider the cases *sub judice* to be "like" *Citibank* and *Chase,* and thus was also not sure that the prior "Bernstein letters" would be applicable to the counterclaims at bar.

Specifically, the *Chemical* Court noted several differences between the cases before it and *Chase.*

> "First, unlike *Chase* ..., the claims pressed here by Banco Nacional as successor came to Banco Nacional as fruit of the Cuban expropriations; they are not claims developed in the ordinary course of its commercial activities, and they did not belong to Banco Nacional at the time of the expropriation of Cuban Electric. More important is the difference in the nature of the counterclaims. [Chase] ... involved counterclaims for expropriation of [its] own property. The present counterclaims are based on expropriation not of defendants' property but of the property of a corporation that simply owed money to the defendants; the defendants' legal premise is not that the expropriation violated their rights under international law, but that there was a breach of an agreement by the Cuban government to pay assumed liabilities." *Chemical,* 658 F.2d at 912.

Plaintiff argues that the differences between the cases presently before this Court and *Citibank* and *Chase* require this Court to ignore the views expressed by the State Department in those prior cases and to apply the act of state doctrine so as to bar the counterclaims brought by the defendants. Were it that simple there would have been no necessity for a remand. Instead, as the *Chemical* panel directed, this Court

on remand must make findings as to the views of the Executive Branch, *i.e.*, do these defendants have a "Bernstein Letter"? *See* 658 F.2d at 912.

The considered but apparently tentative views of the Second Circuit panel respecting the perceived differences between the three *Chemical* cases at bar, and *Chase* and *Citibank* have been given great consideration by me. Nevertheless, despite plaintiff's assertion that they are dispositive (Reply Memorandum of Plaintiff, at 10), the views expressed by the *Chemical* panel are not controlling, nor were they intended to be. First, the Second Circuit panel merely set forth what it considered to be the differences between the cases where there had been "Bernstein letters," and the cases now before this Court. It stated, however, that it was "not sure," due to an inadequate record, whether the cases were "like" one another. Its remand requires this Court to make findings on the point. Nowhere in its decision did the appeals court state that those differences *required* dismissal of the counterclaims; if so, a remand would have been unnecessary. Second, I find that although there are certainly differences between *Chase* and *Citibank* on the one hand, and the cases now before this Court on the other, those differences do not suddenly render the views of the State Department concerning Cuban litigation, views that have remained constant for over a decade, inapplicable to the cases at bar. If this Court were to accept the contrary argument of plaintiff, this Court would have to dismiss every case where there was no "Bernstein letter" sent directly to the presiding court. That was certainly not the circumstance in *Bancec*, where the counterclaims were held justiciable, and the argument cannot be accepted here.

A brief review of the history of the *Bernstein* exception, demonstrates that plaintiff's argument that the act of state doctrine must be invoked in every case unless the record in that case contains a "Bernstein letter", is untenable. For example, in the *Bernstein* case itself, the Court of Appeals had no letter that addressed itself to that particular case. Although there had been a letter sent to plaintiff in that case, there is no indication that the court had ever seen the letter. Instead, the *Bernstein* panel recognized a Press Release of the State Department expressing its position that as a point of "general interest" the Department was publishing a copy of the letter it had issued condemning the taking by the German government of property belonging to victims of Nazi persecution and stating that as a matter of policy it would "relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials." 210 F.2d at 376. The Second Circuit, after printing the substance of the Press Release, concluded:

"In view of this supervening expression of Executive Policy, we amend our mandate in this case by striking out all restraints based on the inability of the court to pass on acts of officials in Germany during the period in question." 210 F.2d at 376.

Just as the *Bernstein* court accepted the views of the Department of State in an announcement that had not been part of the record below, a plurality of the Supreme Court in *Citibank* also took notice of the State Department's position despite the fact that the letter itself had not been submitted to the courts below. 406 U.S. at 780–81, 92 S.Ct. at 1819–20.

Finally, the Court of Appeals in *Chase*, in finding that the requirements necessary to avoid application of the act of state doctrine had been met, relied not only on letters written in 1970 and 1973 that the State Department had sent the Supreme Court in *Citibank*, but also on a further letter that had been issued while the *Chase* appeal was pending before the Second Circuit. Thus, again the letters were dispositive despite their not being part of the record below.

From this review of the history of the "Bernstein letter" I conclude that this Court may, as a matter of discretion, accept the views of the State Department as communicated in any public utterance,

whether it be in this case, other litigation, or as a public announcement.

█ It is, after more than a decade, an "established truth" that the Executive Branch condemns the taking by Cuba of the assets of American-owned firms located in Cuba after the Cuban Revolution. The State Department, through its Legal Adviser, has consistently communicated its position that the courts should not feel restrained from exercising their jurisdiction in such cases. The position of the plaintiff that these cases are not "like" cases is mere conjecture. I conclude as a matter of law that these cases, having arisen out of the Cuban expropriations, are sufficiently similar to permit this Court to recognize public statements by the State Department which express the Executive Branch's approval of judicial intervention in cases such as those at issue here.

The differences between these cases and *Chase* and *Citibank*, as noted by the Court of Appeals preliminarily in *Chemical*, do not presently warrant a finding that this Court should abstain from making a decision on the merits of the counterclaims. The first difference the *Chemical* panel noted was that Banco Nacional's claims against the defendants arose as a result of the Cuban expropriations and not out of the ordinary course of its pre-Revolution banking business. I find, however, that Banco Nacional was expressly designated as the successor in interest of the private banks by Law No. 891 and, as such, it stands in the shoes of its predecessors. No one would argue reasonably that the private banks, had they brought suit on their own behalf, would not be raising a claim arising in the ordinary course of their business. As successor in interest of the private banks, and being a banking organization itself, Banco Nacional, on behalf of the Cuban government, laid claim to all the assets of the private banks and continued to conduct their banking business after the expropriation. Having done so, Banco Nacional stands on the same footing as its predecessors and the business conducted by the private banks in making the deposits with defendants must also be considered the business of Banco Nacional, their successor in interest. I thus conclude that the deposits made by the private banks, and to which Banco Nacional succeeded were indeed, made in the ordinary course of business, both of the banks and of Banco Nacional as part of the Cuban government and, therefore, are "like" the claims asserted by the plaintiffs in *Citibank* and *Chase*.

The second possible factual distinction the *Chemical* court saw between the *Chase* case and the cases now before this Court, is that unlike the circumstances in *Chase*, the claims asserted by plaintiff in the cases at bar did not belong to Banco Nacional at the time of the expropriation of the debts in Cuba owed by Cuban Electric on August 6, 1960. From this, it could be argued that at the time of the expropriation giving rise to the counterclaims, Banco Nacional had not yet become the *alter ego* of the Cuban government, that thus plaintiff's claims do not arise out of a relationship existing when the defendants' counterclaims accrued. Although factually correct, that difference is immaterial. The State Department in *Citibank* and later in *Chase* expressly relieved courts from abstaining in those cases or "like" cases. It is inconceivable that the State Department would rescind that policy based on the mere fortuitous circumstance that the expropriation of the debts of Cuban Electric occurred just two months prior to the nationalization of the private banks. As stated previously, there was a relationship between the private banks as depositors and the defendants, at the very time the Cuban Electric debts were expropriated. The Cuban government, through Banco Nacional later assumed that very same relationship. It cannot now seek to assert the claims based on that relationship and simultaneously avoid the counterclaims for set-off by saying the relationship did not exist at the time the Cuban Electric debts were expropriated. It may be true that had the private banks brought suit on their own behalf, the defendants would not be permitted to set off those claims against their losses from the expropriation of Cuban Electric. That, however, is not the situation here. The Cuban government is now

the owner of the deposits. It brought these actions to recover those deposits. It is not permitted under the equitable principles set forth in both *Bancec* and *Republic of China* decisions to use our courts to recover moneys it obtained through the nationalization of the private banks and simultaneously avoid counterclaims for set-off arising from other related actions taken by the Cuban government as part of the same nationalization policy. *Bancec*, 103 S.Ct. at 2603–04; *Republic of China*, 348 U.S. at 365, 75 S.Ct. at 429.[9]

The third factor, according to the *Chemical* Court, suggesting that the cases at bar were not necessarily "like" *Chase* and *Citibank*, was the nature of the counterclaims. The Court saw the counterclaims in the cases at bar to be different in that they are based on the expropriation, not of the American banks' own property, as clearly was the situation in *Chase* and *Citibank*, but of property of a corporation that "simply owed money to the defendants." *Chemical*, 658 F.2d at 912. Strictly speaking, that analysis represents too narrow a reading of the counterclaims. Considering the counterclaims in the manner in which they were intended by defendants, their true grievance seems to be the expropriation of a chose in action, or debt, the situs of which was and is in Cuba. *See supra* note 6. When the assets of Cuban Electric were expropriated by the Cuban government, defendants allege, so were its liabilities. Consequently, just as was the situation in *Chase*, the defendants seek recovery for the expropriation by Cuba of property in which the defendants have an interest. Moreover, insofar as it is argued by plaintiff that the defendants' counterclaims are based on the breach by the Cuban government of an implied contract to pay the liabilities of Cuban Electric, it is clear that those counterclaims are identical to the counterclaims asserted by the defendant in *Chase*. As was explicitly stated by the *Chase* Court, the defendant, in addition to filing a counterclaim for the expropriation

of its own property, "also asserted an alter counterclaim for the loss of its Cuban branches," claiming "Banco Nacional succeeded to all of the liabilities of the seized branches, and that Chase's Cuban branches were indebted to Chase for approximately $6,000,000." 658 F.2d at 879. Thus, when the "Bernstein letter" issued by the State Department in *Chase* stated that it considered that case to be "like" *Citibank*, it was implicitly referring to the counterclaim, identical to the theory in the cases at bar, based on breach of an implied contract as well as a naked expropriation. Certainly there is no evidence that the State Department differentiated between the alternative counterclaims. It being the view of the State Department that the counterclaims asserted in *Chase* were "like" those in *Citibank*, I am constrained to find that the Department would hold the same view where, as here, the counterclaims are identical in theory to those approved of by the Department in *Chase*.

Taking the similarities between the cases at bar and *Chase* and *Citibank*, I find that the counterclaims in these cases all arise out of the Cuban expropriations of 1960. I further find that the State Department's views, as expressed several times since 1970 requires me to deny plaintiff's motion for summary judgment. In support of my findings I have utilized the three letters that were previously considered by the Second Circuit in *Chase*. I find there is no reason to differentiate between *Chase* and *Citibank* and those cases *sub judice*. Since the letters from the Legal Adviser in *Chase* expressly applied to "like" cases, the State Department's position that the courts should not abstain should be followed here.

This Court is not unmindful that a recent letter from the State Department has been issued to defense counsel in these cases. In that letter, the Legal Adviser to the State Department, having been importuned to issue a "Bernstein letter" directed specifically to this litigation, stated that he

9. The private banks having been dissolved, it becomes obvious that "the Cuban Government and Banco Nacional, not any third parties that may have relied on the separate juridical identi-

ty [of Bancec] would be the only beneficiaries of any recovery." *Bancec*, 103 S.Ct. at 2602. The private banks in the present litigation stand on like footing with Bancec.

would not "make any comment at this time," citing the limited resources of the Department. (Letter of the Legal Adviser, March 7, 1984, Ex. D to Affirmation of Michael Krinsky, Esq., docketed April 10, 1984).

This Court fully understands the lack of sufficient staff in the Department of State to review each and every legal matter presented to it for comment, especially when the United States is not even a party to the action.[10] Nevertheless, my familiarity with the cases at bar, along with the State Department's carefully expressed views as described in the *Chase* and *Citibank* cases, convinces me that the State Department, if given the opportunity to become fully informed as to the substances of the issues herein, rather than being forced to rely merely on the arguments of counsel, would likewise conclude that they are "like" cases and should be heard by this Court on the merits, barring some showing that adjudication would interfere with our Nation's foreign relations. A policy that has remained constant since 1970 and which has never been withdrawn cannot suddenly be deemed abandoned or reversed by a letter of "no comment." Had the Legal Adviser wished to abandon that longstanding policy he could easily have done so.

The attention of the Court has been directed to the testimony of Davis R. Robinson, the Legal Adviser to the State Department, before the Senate Judiciary Subcommittee on Criminal Law on September 14, 1981. In his testimony, the Legal Adviser stated that in cases involving "complex fact patterns arising out of the Cuban expropriations," *id.* at 3, there would be a "United States policy in favor of full compensation" to the parties aggrieved by the expropriation and "the Executive Branch position in those cases [was] that the [act of state] doctrine need not ... [be] applied." *Id.* at 4. Furthermore, he stated, "significantly ... [the courts'] refusal to pass on ques-

tions of foreign governmental conduct may actually frustrate important foreign policy objectives." *Id.* at 7.

We also note the existence of a "Bernstein letter" addressing the case of *Kalamazoo Spice Extraction Co. v. The Provisional Military Government of Ethiopia*, 729 F.2d 422 (6th Cir.1984). A letter issued by the State Department dated November 19, 1982 and referring to the *Kalamazoo* litigation contains certain statements that seem helpful in the context of the present motions:

"In general this Department's experience provides little support for a presumption that adjudication of acts of foreign states in accordance with relevant principles of international law would embarrass the conduct of foreign policy.

[Citation omitted].

The experience of the past seven years has reinforced this conclusion. Accordingly, we believe that a broad, inflexible rule of abstention in expropriation cases is not necessary to safeguard our foreign policy interests ...." (Letter of the Legal Adviser, November 19, 1982, Ex. E to Affidavit of John J. Kerr, Esq., docketed May 1, 1984).

The letter goes on to say that "[i]f ... the Department of State determines in a given case that judicial abstention is necessary ... it will request the department of Justice to communicate that determination to the appropriate court." *Id.* Since this Court has received no such communication, it appears that the decision to entertain the cases now before me on the merits is consistent with the views of the State Department as reflected in the letter issued by the Legal Adviser commenting on the *Kalamazoo* case.

Plaintiff's motions for summary judgment on the counterclaims asserted by defendants are hereby denied.

---

**10.** The genuine possibility that some bureaucrat may find himself too busy or too uncertain to decide whether or not to issue a "Bernstein letter" in some case, underscores the wisdom and foresight demonstrated by Justice Douglas in his *Citibank* concurrence, where he envisioned the courts as becoming "errand boys" for the Department of State, which might "pick the chestnuts" for some litigants, and not others.

Plaintiff's motions for summary judgment on its own claims, which are unopposed, are granted. The Court specifically declines at this time to make the findings contemplated by Rule 54(b), F.R.Civ.P. The parties are directed to appear before this Court for the purposes of a status conference on Friday, November 16, 1984 at 2:00 P.M. in Courtroom 705 to schedule any necessary further proceedings.

So Ordered.