**CARL MARKS & CO., INC. et al., Plaintiffs,**

v.

**UNION OF SOVIET SOCIALIST REPUBLICS, Defendant (Two Cases).**

**Nos. 82 Civ. 1245 (CLB), 82 Civ. 1246 (CLB).**

United States District Court, S.D. New York.

July 31, 1987.

---

324

Edward M. Sills, Lawrence Milberg, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiffs.

Robert Davidson, Baker & McKenzie, New York City, Eugene Theroux (pro hac vice), B. Thomas Peele (pro hac vice), Baker & McKenzie, Washington, D.C., for defendant.

Robert Gaffey, Asst. U.S. Atty., White Plains, N.Y., Elizabeth Sarah Gere, Dept. of Justice, Civ. Div., for U.S.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge:

—Yes well there was just one more thing here I, that I think you might ...

—That? My God, haven't seen one in years.

—No this isn't what I ... what is it.

—Russian Imperial Bond.

—You mean it isn't worth any, worth very ...

—Mister Bast, anything is worth whatever some damn fool will pay for it, only reason somebody can make a market in Russian Imperials is because some damn, somebody like your associate will buy them. Happen to know how he, how this associate of yours got into all this?

—By, well, buying and selling at first I think and then he had some stock in a company and was going to bring some kind of legal suit for, for his class, I mean he ...

—A class action?

William Gaddis, *JR* 201 (1975) [1]

In these two related cases, defendant Union of Soviet Socialist Republics ("USSR" or "Soviet Union") moves to vacate default judgments entered against it by this Court on March 31, 1986, and to dismiss plaintiff's Complaints.

## The Russian Imperial Bonds

The named plaintiffs are class representatives of holders of debt instruments (collectively "the instruments" or "the bonds") issued by the Imperial Russian Government in 1916. Apart from the fact that different instruments are involved in each, these cases are essentially identical.

On December 1, 1916, the Imperial Russian Government issued $25 million in five-year external gold dollar bearer bonds at 5½% interest ("the bearer bonds"). The interest was payable semiannually, each June 1 and December 1 starting June 1, 1917, until the bonds themselves came due on December 1, 1921. These bearer bonds are the subject of No. 82 Civ. 1245.

The second issue, in the amount of $50 million, was assembled by a consortium of United States banks consisting of J.P. Morgan & Co., the National City Bank of New York, Guaranty Trust Company of New York, Lee, Higginson & Co., and Kidder, Peabody & Co., and offered to the public in the form of three-year credit participation certificates at 6½% interest ("the credit participation certificates" or "the certificates"). The contract establishing the credit was executed on June 18, 1916, and the certificates were issued on July 10, 1916. The certificates were due on June 18, 1919, with interest payable semiannually, beginning January 10, 1917, each January 10 and July 10. They are the subject of No. 82 Civ. 1246.

## The Fall of the Russian Empire

The Imperial Russian Government did not long survive these debt issues. The first or so-called February Revolution began in Russia on February 24 (Old Style)/March 8 (New Style), 1917, at a time when that nation was locked in combat on the Eastern front of World War I. The success of the February Revolution was assured by March 12 when the police and military, who at first had fired on the crowds, joined forces with them. On March 14 the ministers of a Provisional Government were named: the following day Czar Nicholas II, last of the Romanovs, abdicated, and the Imperial Russian Government ceased to exist. On March 17, 1917, the United States was the first nation to recognize the new Provisional Government. B. Lincoln, *Passage Through Armageddon* 357 (1986).

The fragile Provisional Government, led at first by Prince Georgi Lvov and later by Lvov's Minister of Justice, a lawyer named

---

1. William Gaddis, author of the novels *Carpenter's Gothic* (1985), *JR* (1975), and *The Recognitions* (1955), is considered by many familiar with his work to be an American novelist in the tradition of Herman Melville. The quotation gives some flavor of Mr. Gaddis's remarkable technical achievement in *JR*, a novel of some 725 pages written almost entirely in dialogue. The plot of *JR* defies brief description, but revolves largely around the exploits of the eponymous JR, a sixth-grader from Long Island who, inspired by a field trip to the offices of the allusively named Typhon International Corp. in which his sixth-grade class purchases one share of Typhon stock as an exercise in corporate democracy, builds his own business empire. In the passage quoted, Edward Bast, a young composer who formerly taught music appreciation at JR's school and has become entangled despite himself in JR's business schemes, is reviewing JR's portfolio, which at this early point in the novel consists entirely of penny stocks and Imperial Russian bonds.

The play on words in Bast's reference to a "legal suit for his class" followed by Crawley's query about "a class action" should not go unremarked. Bast is referring to JR's sixth-grade class with its single share of Typhon stock, but he does not know that, in an exercise of corporate democracy, JR has used that share to bring a strike suit against Typhon—a class action in two senses.

Mr. Gaddis, who supported himself for many years through freelance writing for corporations, shows a remarkable knowledge of the law in *JR*, even to the point of allusions to then-current events. *See, e.g., JR* at 702 (specific reference to effect of *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), on class actions in comment by Typhon executive about "this Eisen ruling first decent decision the damn Court's handed down since FDR packed his [Supreme Court]").

Alexander Kerensky, was unable to withstand the pressures of the continuing world war from without, and of revolutionary opposition, particularly that of the Bolsheviks, led by V.I. Ulyanov, known as Lenin, from within. Significant evidence suggests that the two types of opposition were related, in that the Germans financed the Bolsheviks, knowing that Lenin would promptly sue for peace and eliminate the need for Germany to maintain its Eastern Front. Lenin received safe conduct in April 1917 through the combat lines of the Central Powers, sent in a sealed boxcar, as if his ideas were contagious. *See, e.g.,* H. Shukman, *Lenin and the Russian Revolution* 168–70 (1966). Within six months the Bolsheviks had seized power in the October Revolution, October 24–26 (O.S.)/November 6–8 (N.S.). The fall of the Provisional or Kerensky Government was announced on November 7, and the last pockets of resistance at the Kremlin were wiped out on November 14. *See generally* B. Dmytryshyn, *A History of Russia* (1977); B. Lincoln, *supra;* B. Pares, *A History of Russia* (rev. ed. 1972). Peace with the Central Powers came with the signing of the Treaty of Brest-Litovsk on March 3, 1918.[2]

The Bolsheviks had promised to carry out the Provisional Government's plan to hold free elections for a Constituent Assembly, and did so on November 25/December 8, 1917. The Bolsheviks apparently did not interfere significantly with the election, and finished a respectable but distant second to the Socialist Revolutionary Party. Consequently, on January 19/February 1, 1918, after a stormy one-day session, Lenin dissolved the Constituent Assembly and took the power of Government in Russia to himself. On January 21/February 3, the Bolshevik Government issued a decree regarding the annulment of state loans, which proclaimed among other things that "All foreign loans are annulled

unconditionally and without exception." Findings of Fact and Conclusions of Law in Support of Judgment by Default Pursuant to 28 U.S.C. § 1608(e) ¶ 5. Notwithstanding this decree, interest was paid on the remaining three installments of the certificates, on July 10, 1918, January 10, 1919, and July 10, 1920. Interest was also paid on the bearer bond coupons due on June 1, 1918, December 1, 1918 and June 1, 1918. Thus, what is at issue in this litigation is the Soviet Union's obligation to pay the principal on both instruments and the interest represented by the last five bearer bond coupons.

On July 10, 1918, the Bolshevik regime promulgated the first Soviet Constitution, under which the nation became the Russian Soviet Federated Socialist Republics (R.S.F.S.R.). After a period of intense social, cultural, and economic ferment, the R.S.F.S.R. was succeeded by the present Union of Soviet Socialist Republics upon the promulgation of the second Soviet Constitution on January 31, 1924.

Thus, the decree that gives rise to this case, in which Russia "annulled" all foreign debt obligations including payment on the bearer bonds and the credit participation certificates, was issued by the Bolshevik Government, which was the immediate successor of the Kerensky Government and immediate predecessor of the R.S.F.S.R.

*The Litvinov Assignment and United States Recognition of the Soviet Union*

When the decree was issued, the United States did not recognize the Bolshevik Government: it continued to recognize the Kerensky Government in exile until November 16, 1933, when it recognized the Government of the USSR. Simultaneously, an exchange of letters between President Franklin D. Roosevelt and the People's Commissar for Foreign Affairs of the Soviet Union, Mr. Maxim Litvinov, established what has come to be known as the Litvinov

**2.** The signing of the Treaty of Brest-Litovsk was so long delayed after the October Revolution because Leon Trotsky, the Bolsheviks' principal negotiator, was playing for time in the hope that Bolshevism would sweep Germany as it had swept Russia. In February 1918, however, Trotsky made the strategic error of unilaterally declaring peace, ending the state of truce without a treaty. The German Army promptly went on the march, causing the Bolsheviks to capitulate and sign.

Assignment. *See United States v. Pink,* 315 U.S. 203, 212–13, 62 S.Ct. 552, 556–57, 86 L.Ed. 796 (1942) (reproducing texts of letters); *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) (holding the Litvinov Assignment lawful under President's power to recognize foreign governments). Under the Litvinov Assignment, "preparatory to a final settlement of the claims and counter claims between [the respective governments] and their nationals," *Pink,* 315 U.S. at 212, 62 S.Ct. at 556, the Soviet Union assigned its claims, including those "due it, as the successor of prior Governments of Russia," *id.,* to the United States on condition that it be notified of any recovery by the United States on such claims.

The United States collected $9 million in pre-inflation money as a result of the Litvinov Assignment. *First National City Bank v. Gillilland,* 257 F.2d 223, 225 (D.C. Cir.), *cert. denied,* 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958). In 1955, Congress enacted the Foreign Claims Settlement Act, ch. 645, 69 Stat. 562 (codified as amended at 22 U.S.C. §§ 1621–1641q (1986)). Under this Act, the proceeds of claims collected pursuant to the Litvinov Assignment were deposited into a Soviet Claims Fund. 22 U.S.C. § 1641a(a) (1982). Section 1641d empowered the Foreign Claims Settlement Commission to adjudicate the validity of, and disburse awards for, two kinds of claims. Section 1641d(a)(1) dealt with claims against Russian nationals by United States nationals who had secured prerecognition liens on Russian property located within American jurisdiction that later passed to the United States under the Litvinov Assignment. More importantly, § 1641d(a)(2) empowered the Commission to determine the validity and amounts of "claims, arising prior to November 16, 1933, of nationals of the United States against the Soviet Government." Under § 1641*l,* an award by the Commission for less than the full amount of the claim does not extinguish any rights of the claimant against the Soviet Government.

There is authority for the view that the instruments sued on here were among the "claims" referred to in the Litvinov Assign-

ment. Memorandum of Andrew T. McGuire, General Counsel, Foreign Claims Settlement Commission, May 17, 1956 ["McGuire Memo"], at 5 n. 21 (citing Sack, *Diplomatic Claims Against the Soviets (1918–1938),* N.Y.U. School of Law Contemporary Law Pamphlets, Ser. 1, No. 7, at 55 n. 27 (1938)). In any case it is clear that the Soviet Claims Fund was to be applied, pursuant to § 1641d(a)(2), among other things to the instruments to the extent owned by American citizens. Explicit historical references to the bonds exist. For example, in 1955 the Foreign Claims Settlement Commissioner noted that "The remainder of the fund would go to the payment of awards on some $75 million of repudiated Imperial Russian Government bonds, under a category involving about $350 million, more or less, for the nationalization or confiscation claims...." *Hearings on H.R. 6382 Before the House Comm. on Foreign Affairs,* 84th Cong., 1st Sess. 37 (1955), *quoted in* McGuire Memo at 9. *See also Hearings Before the Senate Comm. on Foreign Relations,* 84th Cong., 1st Sess. 30 (1955) (colloquy concerning distribution of claims on Imperial bonds), *quoted in* McGuire Memo at 10. Pursuant to the Act, 22 U.S.C. § 1641o (a), the Commission distributed the Fund in or about 1959. Bondholders who had filed claims that were certified by the Commission received awards from the Fund. Findings of Fact ¶ 10. Plaintiffs allege that this distribution represents 4% of the value of the bonds.

Meanwhile, as indicated in our opening paragraph, a thriving market had developed for the bonds. A Protective Committee for the certificates was formed on June 17, 1919, and functioned through 1938. Foreign Claims Settlement Commission Panel Opinion 45, in Foreign Claims Settlement Commission, Tenth Semiannual Report to Congress, at 183. As late as 1950 the bearer bonds were listed in Moody's Manual of Investments. The bonds were traded on the New York Curb Exchange, later on the American Stock Exchange from 1921 through 1956, and thereafter over the counter.

Plaintiffs do not cite, and this Court has not discovered, any prior litigation of the validity or enforceability of any Soviet obligation to pay on these instruments. This Court has, however, discovered one case that specifically mentions the credit participation certificates, and another that probably involves the bonds.

*Miller v. National City Bank,* 147 F.2d 798 (2d Cir.1945), was an action by holders of the credit participation certificates against National City Bank of New York and Guaranty Trust Company, two members of the syndicate that floated the credit, for alleged misappropriation of the balance of the credit that remained on deposit when the Bolsheviks repudiated the obligations. The merits of this claim were never reached: our Court of Appeals ruled only on the question whether plaintiffs could meet the jurisdictional amount for diversity cases by claiming the whole unexpended $5 million rather than their individual shares. Ultimately, the case was dismissed on the ground that the New York Supreme Court's determination that the statute of limitations had run was *res judicata.* 166 F.2d 723 (2d Cir.1948).

*Commonwealth Commercial State Bank v. Lucas,* 41 F.2d 111 (D.C.Cir.1930), was a tax case in which "[o]n July 10, 1916, appellant ... purchased Imperial Russian 6½ per cent. bonds, at par value of $40,000. On May 31, 1917, it purchased Imperial Russian Government 5½ per cent. bonds at par value of $11,000." The percentages of interest, dates of purchase, and the fact that the par values are given in dollars make it probable that the bonds were those at issue here. In 1921, the bonds were selling at 10% of their par value. The Bank accordingly tried, on its 1921 tax return, to deduct the $51,000 the bonds cost as a bad debt. The Board of Tax Appeals disallowed the deduction, but the Court of Appeals for the District of Columbia permitted a deduction of 90%, that is, the amount the value of the bonds had declined from par. *Lucas* is thus tangentially relevant to the present case, indicating as it does a judicial recognition as early as 1930 (while the Soviet Government was still unrecognized) that Russian debt securities were in effect uncollectible.

*History of This Litigation*

Plaintiffs initiated these cases by filing a Complaint for each on March 2, 1982. These cases are governed by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611 (1986), which, by specifying exceptions to sovereign immunity, now provides the sole basis for federal court subject matter jurisdiction over suits against a foreign sovereign. 28 U.S.C. § 1604; *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489, 103 S.Ct. 1962, 1969, 76 L.Ed.2d 81 (1983). The FSIA sets out elaborate procedures to ensure that the defendant sovereign receives notice of the suit against it. 28 U.S.C. § 1608. These were fully complied with by plaintiffs. As mentioned above, the Complaints in these cases were filed in this Court on March 2, 1982. In addition, the FSIA requires a plaintiff to file a "notice of suit," a document apprising the foreign sovereign of the pendency of the suit against it, in a form prescribed by the Secretary of State. 28 U.S.C. § 1608(a); 22 C.F.R. § 93.2(a) and Annéx (1987). Notices of suit were filed in these cases on March 12, 1982. Section 1608 also specifies that service of a Summons and Complaint on a foreign state should be made in accordance with bilateral special service arrangements or applicable international conventions. If these are lacking, § 1608(a)(3) provides that service shall be made

> by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head to the ministry of foreign affairs of the foreign state concerned....

Certificates of Mailing executed by the Clerk of this Court, establishing compliance with the § (a)(3) requirements, were filed on March 15, 1982.

This is evidently the mailing the Soviet Ministry of Foreign Affairs returned to the United States Embassy in Moscow under

cover of Diplomatic Note No. 33/ossha, dated May 14, 1982. The Ministry refers to "the documents of the District Court of the Southern District of New York, received by mail," which it is returning "without execution." The Ministry stated the Soviet position that "in accordance with the principle of the sovereign equality of countries ... the Soviet state ... enjoy[s] immunity from jurisdiction of foreign courts [and] can not be brought to am American court as defendant without its evidently expressed consent for it." The Ministry reported that the Soviet Union would not consent to suit, and added that it regarded the suit as a violation of the Litvinov Assignment, under which "the question about consideration of mutual financial claims in legal form has been closed once and for all." The Ministry also announced its expectation that the Executive Branch of the United States Government would intervene to assure Soviet immunity. It did not.

In the meantime, plaintiffs had moved to effect service under § 1608(a)(4), which provides that

> if service cannot be made within 30 days under paragraph (3), [it can be made] by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.[3]

Certificates of Mailing establishing the Clerk of this Court's compliance with § (a)(4) were filed on April 21, 1982.

These documents were received by the State Department Office of Consular Ser-

vices on June 15, 1982. Unfortunately, as an August 9, 1982 letter from Elizabeth Swift, Chief of the Europe and Canada Division of the Office of Citizens Consular Services to plaintiffs' attorney explained, "[d]ue to a misunderstanding ... service ... under the procedures contemplated was not effected by the United States Embassy at Moscow." Counsel informed this Court of the situation by letter dated August 19, 1982, and that same day sent the Clerk of the Court a second set of papers for transmittal to the State Department.

The Certificates of Mailing for these documents were filed on August 20, 1982. The documents were transmitted by the United States Embassy in Moscow to the Soviet Ministry of Foreign Affairs, under cover of Diplomatic Note No. 1710, dated October 20, 1982, a certified copy of which was docketed in this Court on February 17, 1983 after being filed some time during November 1982. Section 1608(c)(1) specifies that "[s]ervice shall be deemed to have been made ... in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note." Thus, service in these cases was complete on October 20, 1982.

The Ministry of Foreign Affairs responded to the transmittal by Diplomatic Note No. 93/ossha, dated November 2, 1982, returning the documents and reiterating the position it had expressed in Diplomatic Note No. 33/ossha, and insisting that "US authorities take immediate and effective measures to provide legal immunity of the USSR and to dismiss the present matter in the court," this notwithstanding that Diplomatic Note No. 1710 had explained that the Executive Branch was not in a position to comment on the suit and that claims of sovereign immunity in particular are to be adjudicated in the United States courts under United States law.

Astonished that a sophisticated major trading nation which enjoys full diplomatic relations with the United States would default the elaborate notice and service provi-

---

**3.** Plaintiffs' attorney seems not to have received a copy of the Soviet Diplomatic Note until June 1982. *See* Affirmation for Order Directing En-

try of Default Against Defendant Under Rule 55(a), Federal Rules of Civil Procedure ¶ 7.

sions of the FSIA, this Court before embarking upon the declaration of a class action and the conduct of an inquest for these ancient dishonored securities, determined to assure that defendant, and the United States also, would have more than the constructive notice which flows from statutory compliance. This Court, on its own initiative, insisted that plaintiffs take further affirmative steps to notify the Soviet Union and to inform appropriate United States officials of the status of the litigation.

On March 18, 1983, plaintiffs submitted a proposed order to this Court directing an entry of default against defendant. At that time this Court declined by an Endorsement Order to sign the proposed order pending further notice to interested parties, and directed that plaintiffs serve copies of the Endorsement Order, the proposed default order with affirmation and exhibits, and the Complaint on the United States Attorney for the Southern District of New York by March 24, 1983, and to the Soviet Ambassador at the Soviet Embassy in Washington, D.C. On March 24, 1983, plaintiffs filed affidavits of service on the parties mentioned. These were measures not required by the FSIA; they were imposed by this Court on its own motion to ensure every reasonable effort to give the defendant notice of the actions against it, so that it could appear to assert any defense including that of sovereign immunity, before an entry of default, and also that the United States Department of Justice be given every reasonable opportunity, if so advised, to intervene on behalf of the United States in a matter of obvious importance to its international relations.

Defendants did not appear in response to this additional notice. By letter dated April 3, 1983, Soviet Consul V. Sinitsyn returned the documents, as well as documents relating to *Frolova v. Union of Soviet Socialist Republics*, 558 F.Supp. 358 (N.D.Ill.1983), *aff'd*, 761 F.2d 370 (7th Cir.1985) (per curiam), advising that "[a]ccording to the existing agreement of 1935 and legal practice these documents must be presented to the Soviet authorities via the Embassy of the United States in

Moscow." This was done under cover of United States Diplomatic Note No. 1454, dated August 7, 1984. The concluding paragraph of that Diplomatic Note stated:

United States law does not require transmittal by counsel for private parties, the Department of State, or the Embassy of the United States of interim documents, such as plaintiffs' requests for preliminary entry of default, to a foreign state defendant that has failed to respond to a complaint within the period specified by United States law. Nevertheless, Judge Brieant requested plaintiffs' attorney to do so with respect to the endorsement orders of March 18, 1983 and related documentation.

*See also* Letter from H. Edward Odom, Chief of European Services Division of the Office of Citizens Consular Services, to Edward M. Sills, Esq., August 31, 1984 ("[T]here is no provision in the [State] Department's regulations requiring it to transmit [interim] papers ... and ordinarily the Department does not do so. In view of their importance to these cases, Judge Brieant's specific request, and other factors, the Department has made an exception to this principle...."). No response was received from the United States Attorney for the Southern District of New York, or anybody else.

Faced with what appeared by then to be a deliberate default, this Court ordered the entry of a default against the Soviet Union on May 3, 1983. Copies of the proposed order had been served on the United States Attorney for the Southern District of New York and the Ambassador of the USSR through the Soviet Foreign Mission in New York City on April 22, 1983. Affidavit of Service of Lawrence Milberg, Esq., April 22, 1983.

This Court notes that it was not until May 23, 1983, about three weeks thereafter, that the Supreme Court decided *Verlinden, supra*, in which it held for the first time that "[u]nder the [FSIA], subject-matter jurisdiction turns on the existence of an exception to foreign sovereign immunity.... Accordingly, even if the foreign state does not enter an appearance to as-

sert an immunity defense, a district court still must determine that immunity is unavailable under the Act." *See also Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir.1985); *Meadows v. Dominican Republic*, 628 F.Supp. 599, 603 (N.D.Cal.1986), *aff'd*, 817 F.2d 517 (9th Cir.1987); *Von Dardel v. Union of Soviet Socialist Republics*, 623 F.Supp. 246, 251 (D.D.C.1985).

The plaintiffs moved for class certification on June 29, 1983, which motion was granted on December 28, 1983. The Notice of Motion for class certification, along with its supporting documents, was also served on the United States Attorney and on the Soviet Ambassador, this time through the Soviet Embassy in Washington, on June 29, 1983.

The process of determining the claims of the class members was not completed until September 20, 1985, when this Court entered an Order Determining Claims. The Court held an inquest on January 3, 1986, and adopted plaintiffs' proposed Findings of Fact and Conclusions of Law on February 3, 1986.

On March 31, 1986, this Court finally entered a final judgment on default against the defendant USSR.

The Clerk of this Court, by letter dated May 1, 1986, sent a copy and translation of the default judgment to the Soviet Ministry of Foreign Affairs in Moscow, as required by 28 U.S.C. § 1608(e). This transaction is evidenced by Certificates of Mailing dated May 2, 1986. These documents were also rejected and returned. On July 11, 1986, the Clerk of the Court sent the documents to the Office of Citizens Consular Services for transmittal to the Soviets. The documents were sent to the United States Embassy and therewith transmitted under cover of Diplomatic Note No. 1772, dated August 27, 1986, which among other things noted that property of a defaulting defendant in the United States is subject to attachment by the plaintiff, and urged the Soviet Union to appear through United States counsel, if so advised, to seek relief from the default judgment. *See* Letter of Deborah A. McCarthy, Consular Affairs Officer, Europe and Canada Division, Office of Citizens Consular Services, to Edward Aponte, Chief Deputy Clerk, United States District Court for the Southern District of New York, September 8, 1986, and attachments. The Soviet Union's response, dated October 11, 1986, was not sent to this Court by the State Department until February 4, 1987. The Soviet Union again rejected service, reiterated its claim of absolute immunity, and stated that any attempt to enforce the default judgment, by attachment or otherwise, "would have most serious consequences for relations between our countries undermining the possibility of normal development of bilateral relations in different spheres."

In spite of the harsh rhetoric of its October 11, 1986 note, the Soviet Union thereafter retained counsel in the United States, and on March 30, 1987 filed a Notice of Motion to vacate the default judgment and dismiss the Complaint, with supporting documents.

On May 27, 1987, the United States for the first time submitted a Statement of Interest, as well as Declarations from Thomas W. Simons, Jr., Deputy Assistant Secretary of State for European and Canadian Affairs, and the Honorable Abraham D. Sofaer, a former Judge of this Court, now Legal Adviser to the Department of State. The Declarations both detailed how representatives of the United States had, after the entry of the default judgment, endeavored to explain to the Soviet Union that the United States adhered to the restrictive theory of sovereign immunity, that under the FSIA determinations of immunity are made by the United States courts rather than by the Executive Branch, that the Soviet Union would consequently be well advised to appear in these cases, and that it could do so in order to contest the issue of its absolute sovereign immunity, without thereby waiving that immunity and submitting itself to the jurisdiction of the United States courts.

The Statement of Interest argues in detail that the default judgment should be held void for want of jurisdiction and the Complaints dismissed. All of the United

States' submissions insist on the importance of this litigation to bilateral relations between the United States and the Soviet Union. However, as the procedural history just detailed makes clear, this Court went well out of its way to give notice of the progress of these lawsuits not only to the Soviet Union but also to the Executive Branch of our own Government, apprising both the State Department and the United States Attorney for the Southern District of New York of all developments, although it was not obliged to do so under the FSIA. This Court took these actions because of its own concern at the time to spare itself, the plaintiffs, the United States, and the Soviet Union the embarrassment and waste of effort that the entry of a default judgment, and the proceedings to determine its validity that would eventually but necessarily follow, might occasion. This Court is convinced that the USSR at all times knew that it was necessary to answer and appear in order to assert the waivable affirmative defense of sovereign immunity or plead the effect of the Litvinov Accord.

But for the fact that the USSR seems to present singularly compelling grounds for the relief requested, on the merits, we would leave the defendant to its laches, its neglect, and its studied and intentional default.

Plaintiffs filed their papers in opposition to the motion on May 29, 1987, oral argument was had on July 15, 1987, and decision reserved.

### Rule 60(b)(1) and (b)(6) Considerations

■ The Soviet Union seeks relief from the default judgment under Rule 60(b) of the Federal Rules of Civil Procedure. In general, in deciding whether to grant a motion to vacate under Rule 60(b)(1) or (b)(6), courts consider whether the default was willful, whether defendant offers a meritorious defense, and how severely the nonmoving party would be prejudiced if the default judgment is vacated. *Davis v. Musler*, 713 F.2d 907, 915 (2d Cir.1983).

Our Court of Appeals has noted that "prejudice" here does not mean mere delay: "Rather, it must be shown that delay will 'result in the loss of evidence, create in-

creased difficulties of discovery, or provide greater opportunity for fraud and collusion.'" *Davis*, 713 F.2d at 916 (*quoting* 10 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2699 at 536–37 (1983)). Here, no such effects can result from vacating the default judgment. Plaintiffs have already collected all the evidence they are going to, and the only issues raised by defendant's belated appearance are issues of law.

Moreover, under the circumstances of this case, the Soviet Union's willful default is tempered by its genuine but unfounded belief that it enjoys such sovereign immunity that it can merely crumple and discard our legal process, and that this inherent quality of sovereignty cannot be impaired unilaterally by the United States' adoption of the FSIA. *See Jackson v. People's Republic of China*, 794 F.2d 1490, 1496–97 (11th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987).

We also believe that the Soviet Union has tendered meritorious defenses. To do so, a moving party "need not conclusively establish the validity of the defense(s) asserted," *Davis*, 713 F.2d at 916; "[i]t is sufficient to state defenses which, if established on trial, would defeat plaintiff's action," *Horn v. Intelectron Corp.*, 294 F.Supp. 1153, 1155–56 (S.D.N.Y.1968) (Lasker, J.). *Cf. United States v. Moradi*, 673 F.2d 725, 727 (4th Cir.1982) ("[A]ll that is necessary to establish the existence of a 'meritorious defense' is a presentation or proffer of evidence, which, if believed, would permit either the Court or the jury to find for the defaulting party."). Here, the Soviet Union has raised at least three defenses, any one of which would be complete: the statute of limitations; the effect of the Litvinov Assignment; and the inapplicability of the FSIA to pre–1952 claims. For these reasons, it would be appropriate to relieve the defendant from its default.

### The FSIA and Rule 60(b)(4)

The Soviet Union also moves to vacate under Rule 60(b)(4). In FSIA cases, the differences between these motions offer the potential for confusion. Rule 60(b)(1) and (b)(6) motions require a court to exam-

ine the merits of a case—to find that there are meritorious defenses or other equitable reasons for vacating a default judgment. Rule 60(b)(4) motions, however, are jurisdictional: a successful (b)(4) motion establishes only that the default judgment was void for want of jurisdiction, and is not a judgment on the merits. *See generally Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) ("[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.")

In an FSIA case, the potential confusion results because a Rule 60(b)(4) dismissal can look like a dismissal for failure to state a claim upon which relief can be granted, and appear thereby to violate the rule of *Bell v. Hood.* The reason is that, as many courts have observed, the FSIA begins with a presumption of immunity that is only overturned if the plaintiff can demonstrate that the defendant sovereign's activity sued on falls under one of the exceptions to immunity enumerated at 28 U.S.C. §§ 1605 and 1607. Thus, as our Court of Appeals has observed, "In many cases a resolution of the substantive immunity law issues will be required in order to reach a decision on subject matter jurisdiction.... [A] court may have to interpret the substantive principles embodied in §§ 1605–1607 before deciding whether to take jurisdiction." *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 790–91 n. 4 (2d Cir.1980), *cert. denied sub nom. Corporacion Venezolana de Fomento v. Merban Corp.,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981).

In the present case, this Court holds that plaintiffs have indeed stated a claim under the FSIA, inasmuch as the Imperial Russian Government's offering of the bonds is a commercial activity in the sense of § 1605. The Court then goes on to hold, however, that because the FSIA does not apply retroactively to pre–1952 claims, sovereign immunity deprives this Court of jurisdiction over what we first determined to be a claim under the FSIA. The dismissal is, therefore, one for want of jurisdiction, not one on the merits, even though the Court must consider the merits before determining whether it has jurisdiction, in seeming violation of *Bell v. Hood, supra.*

### The FSIA and the History of Sovereign Immunity

Section 1604 of the FSIA provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

As noted *supra,* in virtue of § 1604 the Act is the sole basis for federal court subject matter and personal jurisdiction over a foreign sovereign. "If one of the specified exceptions to sovereign immunity applies, a federal district court may exercise subject-matter jurisdiction under § 1330(a); but if the claim does not fall within one of the exceptions, federal courts lack subject-matter jurisdiction." *Verlinden,* 461 U.S. at 489, 103 S.Ct. at 1969 (footnote omitted) (observing in footnote that when federal court lacks subject matter jurisdiction over foreign sovereign it also lacks personal jurisdiction). *See also id.* at 493, 103 S.Ct. at 1971; *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 372 (7th Cir.1985) ("[T]he comprehensive scheme established by the FSIA is the exclusive means by which foreign countries may be sued in American courts."); *Jackson v. People's Republic of China,* 596 F.Supp. 386, 387 (N.D.Ala.) (citing cases), *aff'd,* 794 F.2d 1490 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987).

The evolution of foreign sovereign immunity in the United States courts presents an interesting story. For most of its history, as a matter of comity, the United States granted foreign sovereigns absolute immunity from suit in its courts. The classic expression of the doctrine of absolute immunity in our courts was offered, in language resonant of Thomas Hobbes, by Chief Justice Marshall in *The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 137, 3 L.Ed. 287 (1812):

This full and absolute territorial jurisdiction being alike the attribute of every sovereign, and being incapable of conferring extra-territorial power, would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects. One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him.

This perfect equality and absolute independence of sovereigns, and this common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to wave [sic] the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation.

This passage from *The Schooner Exchange* was quoted in *Berizzi Brothers Co. v. S.S. Pesaro*, 271 U.S. 562, 572, 46 S.Ct. 611, 612, 70 L.Ed. 1088 (1926), as the Court's justification for extending immunity in an *in rem* action against a merchant ship owned and controlled by the Italian government. The Court reached this decision even though the State Department, in the court below, had said "It is the view of the Department that government-owned merchant vessels ... employed in commerce should not be regarded as entitled to ... immunit[y]." *The Pesaro*, 277 F. 473, 479–80 n. 3, *quoted in Republic of Mexico v. Hoffman*, 324 U.S. 30, 38, 65 S.Ct. 530, 534, 89 L.Ed. 729 (1945) (Frankfurter, J., concurring). Thus, it would appear that as of 1926 the Supreme Court relied on general principles of international law in immunity determinations: in *The Pesaro* it refused to recognize what we now call the "commercial activity" exception to sovereign immunity, even though the State Department urged that position upon it. There was a difference of opinion in the Executive Branch on this issue as early as 1918, when in an exchange of letters the Attorney General claimed that foreign merchant vessels were entitled to immunity and the Secretary of State denied that view. *Restatement (Second) of Foreign Relations Law of the United States* § 69, at 211 (1965).

By the 1940s the Supreme Court had adopted a policy of deference to the Executive Branch on a case by case basis: "It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35, 65 S.Ct. 530, 533, 89 L.Ed. 729 (1945). *See Verlinden*, 461 U.S. at 486, 103 S.Ct. at 1967, *citing Ex Parte Republic of Peru*, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943) (stating principle of judicial deference to State Department determination of foreign sovereign's entitlement to immunity, in case in which State Department had certified such entitlement), and *Hoffman*, 324 U.S. at 33–36, 65 S.Ct. at 531–33 (reaffirming principle of judicial deference but exercising *in rem* jurisdiction in absence of State Department certification of immunity or evidence that United States would customarily recognize immunity); *Restatement (Second) of Foreign Relations Law of the United States* § 69 at 212–13 (1965). Indeed, in *Hoffman* Justice Frankfurter's concurrence suggests that the Court effectively overruled *The Pesaro*. *Hoffman*, 324 U.S. at 38–42, 65 S.Ct. at 534–36; *see Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 700 & 700–701 n. 14, 96 S.Ct. 1854, 1864 & 1864 n. 14, 48 L.Ed.2d 301 (1976).[4]

---

**4.** Writing for the majority a decade later in *National City Bank v. Republic of China*, 348 U.S. 356, 361, 75 S.Ct. 423, 427, 99 L.Ed. 389 (1955), Justice Frankfurter retreated so far from *The Pesaro* as to say that "a major consideration for the rule enunciated in *The Schooner Exchange* is the embarrassing consequences which judicial rejection of a claim of sovereign immunity may have on diplomatic relations." Of course, that is not to say that this is the consid-

In any case, after *The Pesaro*, "the executive department filed suggestions of immunity in conformity with that decision in cases involving merchant vessels owned and operated by foreign states." *Restatement (Second) of Foreign Relations Law of the United States* § 69 at 212–13 (1965).

More generally, "[u]ntil 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns." *Verlinden*, 461 U.S. at 486, 103 S.Ct. at 1968.

In 1952, a sea change occurred when the State Department announced, in the so-called Tate Letter, its adoption of the "restrictive" theory of sovereign immunity. Letter of Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman, May 19, 1952, *reprinted in* 26 Dep't of State Bull, 984–85 (1952) and *Alfred Dunhill of London Inc. v. Republic of Cuba*, 425 U.S. 682, 711–15, 96 S.Ct. 1854, 1869–71, 48 L.Ed.2d 301 (1976). Under the restrictive theory, immunity is extended only to a foreign sovereign's "public acts," (*jure imperii*), not its "private," including commercial, acts (*jure gestionis*). Legal Adviser Tate noted that "a shift in executive policy cannot control the courts," but believed that "the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so," noting that "at least some Justices of the Supreme Court" thought that Executive Branch determinations of immunity should be dispositive. *Dunhill*, 425 U.S. at 714, 96 S.Ct. at 1871.

Congress enacted the FSIA in 1976, at the urging of the Department of State, because some thought the policy embodied in the Tate Letter had proved awkward to implement and required codification. *See Verlinden*, 461 U.S. at 487–88, 103 S.Ct. at 1968. As has been noted *supra*, the FSIA is now the exclusive basis for federal court jurisdiction over suits against a foreign sovereign, and a court lacks both subject matter and personal jurisdiction over the sovereign unless one of the exceptions set out in 28 U.S.C. §§ 1605–1607 applies. 28 U.S.C. § 1604.

Plaintiffs submit that at least two of the FSIA exceptions apply to this case: first, issuance of the bonds in the United States was a commercial activity, and so not entitled to immunity in virtue of § 1605(a)(2) (no immunity in cases "in which the action is based upon a commercial activity carried on in the United States by the foreign state"); second, the annulment of foreign loans was an expropriation illegal under international law, that is, a taking of the bondholders' property right to receive payments on their bonds, and so subject to the illegal takings exception under § 1605(a)(3) (no immunity in cases "in which rights in property taken in violation of international law are in issue and that property ... is present in the United States in connection with a commercial activity carried on in the United States by. the foreign state").

■ This Court will not address plaintiffs' contention that the bond issue is subject to the § (a)(3) exception, because we are persuaded by plaintiffs' contention that the flotation of the bonds was a commercial activity within the meaning of the FSIA.[5] Plaintiffs cite unequivocal language in the legislative history to support that contention. The House Report characterized commercial acts generally as "those which private persons normally perform," or "of the same character as ... might be made by a private person." H.R. No. 94–1487 at 14, *reprinted in* U.S. Code Cong. & Ad. News 6604, 6613, 6615 (1976). Issuance of debt instruments is certainly an activity in which private parties engage. Indeed, the House Report specifically singles out such activity: "Moreover, both a sale of bonds to the public and a direct loan from a U.S. commercial bank to a foreign government are activities which are of a commercial nature and should be treated like other similar commercial transactions." *Id.* at

eration that moved Chief Justice Marshall and his colleagues to enunciate the rule.

**5.** The Court notes that this case is not affected by the Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2) (1986) (forbidding courts to invoke

Act of State doctrine to decline to adjudicate, on the merits, claims arising out of expropriations in violation of international law after January 1, 1959), and therefore we need not consider the expropriation issue.

10, U.S.Code Cong. & Ad.News 1976, 6609. "This definition includes ... an indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States, or which receives financing from a private or public lending institution located in the United States." *Id.* at 17, U.S.Code Cong. & Ad.News 1976, 6615. Thus, it seems clear, and the Soviet Union does not dispute, that a foreign bond issue subsequent to the effective date of the FSIA would fall within the commercial activity exception. *See Slade v. United States of Mexico,* 617 F.Supp. 351, 355 & n. 12 (D.D.C.1985), *aff'd mem.,* 790 F.2d 163 (1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987); *see also Schmidt v. Polish People's Republic,* 579 F.Supp. 23, 26 (S.D.N.Y.), *aff'd,* 742 F.2d 67 (2d Cir.1984). The dispositive issue before this Court, therefore, is the same as that in *Slade* and *Jackson* : whether the FSIA applies retroactively so as to confer jurisdiction over a foreign sovereign for its commercial activities engaged in long before the effective date of the FSIA and before the 1952 Tate Letter. If so, this Court had jurisdiction to enter a default judgment, which should now be vacated granting leave to the Soviet Union to answer or move with respect to the Complaint. If not, the Complaint must be dismissed for want of subject matter jurisdiction.

### Retroactivity and the FSIA

In general, "[t]he presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other." *United States Fidelity & Guaranty Co. v. United States ex rel. Struthers Wells Co.,* 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908). Indeed, drawing on *Struthers Wells* among other sources, Justice Rehnquist recently wrote that "[t]he principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student." *United States v. Security Industrial Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982).

Plaintiffs argue that this general principle is subject to an exception that applies to the FSIA: a statute may be applied retroactively if it is "remedial," that is, if its retroactive application would not interfere with "substantive" or "vested" rights. *See, e.g., Union Pacific Railroad Co. v. Laramie Stock Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913); *United States v. Kairys,* 782 F.2d 1374, 1381 (7th Cir.) ("In order for a statute to be considered remedial it must be one that neither enlarges nor impairs substantive rights but relates to the means and procedures for enforcement of those rights."), *cert. denied,* —— U.S. ——, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). Plaintiffs argue that the FSIA plainly states that it is applicable to all actions against a foreign state, without limitation as to time; that retrospective application would not deprive the Soviet Union of any antecedent rights, because absolute sovereign immunity before the Tate Letter had been a matter of comity rather than of right; that the FSIA is remedial, in that it creates no new rights but only provides a structure for enforcing independently or antecedently existing rights; and that a number of courts have in fact applied the FSIA in cases involving transactions that occurred before its effective date. We take up each of these arguments in turn.

### Construction of the FSIA

■ Our Court of Appeals has observed that the "[d]etermination of retroactivity [is] a matter of statutory construction." *Litton Systems v. American Telephone & Telegraph Co.,* 746 F.2d 168, 174 (2d Cir. 1984). This Court is unable so to read the FSIA's plain language and legislative history so as to give it retroactive effect. Congress provided a ninety-day grace period between the passage of the FSIA and its effective date, to put foreign sovereigns on notice of the codification of United States policy. *Jackson,* 596 F.Supp. at 388. "Such a postponement of a statute's effective date is evidence of the legislature's desire that it be given prospective application only." *Buccino v. Continental Assurance Co.,* 578 F.Supp. 1518, 1527 (S.D. N.Y.1983); *see Ocean & Atmospheric Science v. Smyth Van Line, Inc.,* 446 F.Supp. 1158, 1159 (S.D.N.Y.1978). Moreover, the jurisdictional section, 28 U.S.C. § 1330(a), provides that the district courts "*shall*

*have"* jurisdiction over the cases specified in §§ 1605 and 1607 (emphasis supplied). The use of "shall have" indicates prospective application. *Martropico Compania Naviera S.A. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Pertamina),* 428 F.Supp. 1035, 1037 (S.D.N.Y. 1977).

Thus, the plain language and legislative history of the statute provide thrusts against, rather than for, a congressional intent that the FSIA be applied retroactively. This conclusion accords with that reached by our Court of Appeals in *Schmidt v. Polish People's Republic,* 742 F.2d 67 (2d Cir.1984). *Schmidt* involved notes on which Poland defaulted in 1939 because of the outbreak of World War II. The plaintiffs argued that the statute of limitations had not run because under New York law it is tolled when the defendant is absent from the jurisdiction, and Poland was not present in the jurisdiction—that is, amenable to process—until January 19, 1977, when the FSIA became effective. As Judge Winter observed, this "inventive argument," 742 F.2d at 70, "construes the FSIA as reviving all claims, however dormant, existing against foreign governments at any time before its passage." *Id.* at 71. That proved sufficient reason for the Court of Appeals to reject the argument:

> We believe this infuses the Act with consequences wholly uncontemplated by Congress. While the Act indisputably enhances a party's capacity to gain personal jurisdiction over a foreign state ... nothing in its language or legislative history indicates that such wholesale reactivation of ancient claims was intended.... Moreover, since the "Tate Letter" ... foreign sovereign immunity had not extended to the commercial activity of a foreign state ... and Congress had no reason whatsoever to believe that it that it was reviving otherwise dormant claims based on such activity.

*Id.*

### Was Absolute Immunity an Antecedent Right Eliminated by the FSIA?

Plaintiffs' second and third contentions go hand in hand. If the FSIA is merely remedial, it can be applied retroactively. To say that a statute is remedial is simply to say that it does not prejudice antecedent rights. Thus, if absolute sovereign immunity is not a matter of right, the FSIA is merely remedial and can be applied retroactively to sovereigns' commercial activities, because sovereigns had no antecedent right no, to be sued for the consequences of such activities.

Plaintiffs rest their contention that absolute immunity is not an antecedent right on Chief Justice Burger's remark in *Verlinden* that "[a]s *The Schooner Exchange* made clear ... sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." 461 U.S. at 486, 103 S.Ct. at 1967. Chief Justice Burger went on to observe that "[a]ccordingly, this Court consistently has deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Id.* Plaintiffs rely on this passage to support the view that absolute immunity was a matter of executive grace, such that the Executive Branch could acknowledge or withhold immunity on a case-by-case basis, in the tradition of the "Bernstein letter" approach to the analogous "Act of State" doctrine. *See Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvart-Maatschappij,* 210 F.2d 375 (2d Cir.1954) (Court of Appeals refused, for the first time, to apply Act of State doctrine, relying on a letter and press release from State Department Legal Adviser relieving American courts of such restraints on their jurisdiction in considering validity of Nazi official actions).

This Court's analysis of the history of foreign sovereign immunity shows that plaintiffs' picture is over-simplified. It was not always true that the Supreme Court deferred to executive branch determinations of immunity: as late as 1926, in *The Pesaro,* the Court found immunity, relying on the general and abstract principles laid

down in *The Schooner Exchange,* in spite of the State Department's arguments to the contrary. It is fair to say that as late as 1926 the Supreme Court regarded sovereign immunity as a right grounded in the natural law of international relations. Only in the 1940s, in cases such as *Ex Parte Peru* and *Mexico v. Hoffman,* which the Chief Justice cites in *Verlinden,* did the Supreme Court adopt a policy of deference to the executive. It is ironic, moreover, that, as the drafters of the Restatement point out, the State Department began requesting immunity for foreign sovereigns as a matter of course only after and in response to *The Pesaro. Restatement (Second) of Foreign Relations Law of the United States* § 69, at 212–13. In light of *The Pesaro,* we may venture with some confidence to say that as late as 1926, almost a decade after the Soviet debt repudiation at issue in this case, the federal courts would not have taken jurisdiction over any instrumentality of a foreign sovereign—let alone the sovereign itself—no matter what the Executive Branch recommended.

Moreover, one should consider Chief Justice Burger's distinction between comity and constitutionality in the context of *Verlinden;* the question presented in that case was whether the FSIA permitted foreign plaintiffs to sue foreign sovereigns in courts in the United States, and if so whether this represented an unconstitutional expansion of the federal courts' Article III jurisdiction. The contrast between "matters of grace and comity" and "restrictions imposed by the Constitution" is not, in this context, one between matters of international etiquette and constitutional right, but between matters of right grounded in comity and matters of right grounded in the Constitution. Chief Justice Burger is reminding us that although the federal courts would not have entertained an action against a foreign sovereign during the era of absolute immunity, they could have done so without violating the Constitution. They did not entertain such actions, as *The Schooner Exchange* made clear, because to do so would have violated general principles of international law which are *enforceable* only by appeal to grace and comity. That this is so makes the rights granted thereby to sovereign nations, no less genuine. The United States could at any time, and did in 1952, cease to grant absolute sovereign immunity without violating the Constitution, but only at the cost of ceasing to recognize a principle that it previously considered to express a right under international law, and which other sovereigns still hold valid.

This Court recognizes that other sovereigns still adhere to the doctrine of absolute sovereign immunity. Adherence to that theory, however principled, cannot be used as a basis for a United States Court to excuse a foreign sovereign from the obligation to appear after notice and assert its defenses, including that of immunity, under pain of suffering a default and the customary consequences thereof, including admission of the allegations of the Complaint. Some foreign sovereigns may be unfamiliar with the United States' adoption of the restrictive theory of sovereign immunity and its codification in the FSIA, and their failure to appear may be understood in this light, and to that extent mitigated. The Department of State shows here that it has undertaken the task of educating such sovereigns about the United States' legal system. The Soviet Union, however, is far from an unsophisticated litigant in the United States courts. It has frequently appeared in other cases to assert its immunity. *See Von Dardel v. Union of Soviet Socialist Republics,* 623 F.Supp. 246, 252 (D.D.C.1985) (collecting cases).

█ Thus, this Court has no hesitation in holding that a foreign sovereign's pre–1926 settled expectation that it was absolutely immune from suit in the United States courts rises to the level of an antecedent right. For until 1926 at least, the Supreme Court recognized absolute sovereign immunity on the basis of the abstract principles of international law stated in *The Schooner Exchange.* At some point after 1926, the courts deferred to the customary recommendation of immunity tendered by the State Department: this shift changed the basis, but not the fact, of the settled expec-

tation of immunity. Only after 1952 was it reasonable for a foreign sovereign to anticipate being sued in the United States courts on commercial transactions.

▓ In short, this Court is persuaded by the reasoning of decisions such as *Jackson* and *Slade* that retroactive application of the FSIA to pre–1952 transactions and events would affect foreign sovereigns' antecedent rights adversely. This Court endorses the holding of the district court in *Jackson:*

> At the time of the issuance of the bonds in 1911 up until the date of their maturity in 1951, China relied on the well-founded expectation that the then extant, almost universal doctrine of absolute sovereign immunity governed all interactions between her and the United States and the citizens of the two respective countries. Concomitantly, China had no expectation of being haled into a court in the United States to answer for any default of the bond issue. Similarly, the predecessors in interest of the plaintiff bondholders class had no expectation of any right to bring an action in a court of the United States upon a default of the bond issue.

596 F.Supp. at 389. The district court's similar observations in *Slade* are equally apposite:

> [T]o apply the FSIA to the underlying transactions would clearly prejudice the antecedent rights of Mexico. Between 1922 and 1951, the government of Mexico could safely assume that the then existing doctrine of absolute immunity governed any commercial transaction be-

tween it and the United States or its citizens. Mexico could therefore not reasonably anticipate being haled into court in the United States for defaulting on public debt instruments. Nor, for that matter, could holders of bonds and interest coupons reasonably expect to bring an action against Mexico in a United States court in the event of such a default. The Court finds that because Mexico may have reasonably relied on these factors in structuring its conduct prior to 1952, it would be inequitable to divest Mexico of the absolute immunity it enjoyed in 1922 by applying the FSIA to this case.

617 F.Supp. at 358 (footnotes omitted).[6]

This Court has undertaken its own study of cases between 1927 and 1952 involving the various Russian Governments and the Litvinov Assignment, in order to ascertain whether prior to 1952 foreign sovereigns indeed had the expectation of not being sued for their commercial activities in United States courts. Our inquiry lends support to the view that before 1952 the United States courts would have treated the Russian Governments as entitled to absolute sovereign immunity, except insofar as those Governments could have been considered to have waived their immunity or consented to setoffs by appearing as plaintiffs or the assignors of plaintiffs in the United States courts.

### The Russian Governments in United States Courts, 1927–1952

Three lines of cases involving the various Russian Governments show that the Soviet Union had a justified expectation of abso-

---

**6.** One potential source of confusion should be dispelled here. The phrase "haled into court" risks confusion to the degree it can be taken to allude to *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) ("[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."), a case that explored the doctrine of minimum contacts as a prerequisite for *personal* jurisdiction, not subject-matter jurisdiction. The Court makes this observation because the Soviet Union here twice cites *Woodson* when subject matter jurisdiction rather than personal jurisdiction is at

issue. Memorandum of Union of Soviet Socialist Republics in Support of Its Motion for Relief from Judgment by Default and for Dismissal at 12 n. 6 (citing *Woodson* in support of quotation from *Slade* given *supra*); Reply of Union of Soviet Socialist Republics to Opposition to Motion for Relief from Judgment by Default and for Dismissal at 9–10. The phrase can be used to refer to subject-matter jurisdiction, however, as in Justice Frankfurter's discussion of foreign sovereign immunity in *National City Bank v. Republic of China*, 348 U.S. 356, 358, 75 S.Ct. 423, 426, 99 L.Ed. 389 (1955) ("The freedom of a foreign sovereign from being haled into court as a defendant has impressive title-deeds.").

**340**

lute sovereign immunity from suit in the United States courts arising from its repudiation of foreign debts. First, a number of cases brought by the Imperial and Provisional Governments involved the status of the Russian Governments as successors in interest to one another before and after the recognition of the Soviet Union. Second, the validity of the Litvinov Assignment was several times the subject of litigation. Third, after the Litvinov Assignment was upheld by the Supreme Court, the United States spent eighteen years, *see First National City Bank v. Gillilland,* 257 F.2d 223, 225 (D.C.Cir.), *cert. denied,* 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958), litigating to collect the assets that had passed to it under the Assignment. Such litigation tended to fall into a pattern. The United States would typically sue to recover Russian deposits in American banks that had passed to the Soviets through their nationalization decrees.[7] The banks would then either dispute the validity of the nationalization decrees or of the Litvinov Assignment, or concede their validity but insist that the deposits be counted as setoffs against Russian debts owed to the same bank, thereby implicitly challenging the Soviet repudiation of foreign debts.

*The Successor-in-Interest Cases*

Although, as Justice Frankfurter remarked concurring in *Pink,* "[o]ne cannot read this body of judicial opinions ... and not be left with the conviction that they are the product largely of casuistry, confusion, and indecision," *Pink,* 315 U.S. at 203, 62 S.Ct. at 235 (Frankfurter, J., concurring), the successor-in-interest cases do present a common theme. All held, following *The Sapphire,* 78 U.S. (11 Wall.) 164, 20 L.Ed 127 (1871), that the possessor of rights and obligations in the international sphere is an abstract concept, the State, rather than the governments that purport from time to time to represent it. *See Guaranty Trust Co. v. United States,* 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938) ("[T]he principle controlling here [is] that the rights of a sovereign state are vested in the

state rather than in any particular government which may purport to represent it" (citation omitted)); *Lehigh Valley Railroad Co. v. State of Russia,* 21 F.2d 396, 400 (2d Cir.) ("The state is a community or assemblage of men, and the government the political agency through which it acts in international relations.... The foreign state is the true or real owner of its property, and the agency the representative of the national sovereignty.") (citations omitted), *cert. denied,* 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432 (1927); *id.* at 401 ("[T]he state is perpetual, and survives the form of its government."); *United States v. National City Bank,* 90 F.Supp. 448, 452 (S.D.N.Y.1950) ("[T]he State of Russia was the obligor on the Notes before the revolution and ... the State of Russia continued as the obligor after the revolution. The regime in power changed. The state, as a continuing personality, persisted."). The natural corollary of this view of the State as abstract entity is that the government that can sue and, if it waives immunity, be sued, on the rights and obligations of the State is the one recognized by the Executive Branch. *Guaranty Trust Co. v. United States,* 304 U.S. at 137, 58 S.Ct. at 791 ("[S]uit in [the State's] behalf may be maintained in our courts only by that government which has been recognized by the political department of our own government as the authorized government of the foreign state.").

*Lehigh Valley, supra,* decided in 1927, held that "Proof of the agency ... is dependent entirely upon the political fact of the recognition by the political department of the government.... *If it be a fact that there is a Russian Socialist Federated Republic now in charge of the government of Russia, it would bring no different result here.*" 21 F.2d at 400 (emphasis supplied). This argument or contention is surely open to question. The Provisional Government ceased to function as a government as soon as it was overthrown. After his escape from Russia, Alexander

---

7. The nationalization of the Russo-Asiatic Bank seems to have been responsible for most such litigation.

Kerensky edited an emigre newspaper in Paris; he did not come to New York City until 1940, where he lived out his life, and he was not treated as a head of state before recognition of the Soviet Union in 1933. *See generally* R. Abraham, *Alexander Kerensky: The First Love of the Revolution* (1987). Neither did his Provisional Government function as a government in exile. Indeed, as far as this Court has discovered, the United States' continued recognition of the Provisional Government consisted primarily in its recognition of its Ambassador, Mr. Boris Bakhemeteff, and of its Financial Attache, Mr. Serge Ughet. *See, e.g., Lehigh Valley,* 21 F.2d at 400 (noting Bakhemeteff's and later Ughet's authority over property of Russian Government). Under these circumstances, one can sympathize with Justice Frankfurter's evident impatience with *Lehigh Valley,* which he characterized as reaching the "fantastic" conclusion that "the Kerensky regime was, in accordance with diplomatic determination, treated as the existing Russian government a decade after its extinction." *Pink,* 315 U.S. at 236, 62 S.Ct. at 568 (Frankfurter, J., concurring).

In any case, under the abstract theory of the State, the United States courts unanimously held that between March 17, 1917 and November 16, 1933, the Provisional Government possessed standing, and the Soviet Government lacked standing, to appear in the United States courts. Conversely, they held that once the Soviet Government was recognized, the Provisional Government lost standing to appear in the United States courts. Thus, the Soviet Government was uniformly treated as the successor in interest to the Provisional Government, which in turn was the successor in interest to the Imperial Russian Government. Indeed, as the district court remarked in *United States v. National City Bank,* the Soviet Government understood itself as successor in interest to its predecessors:

> [A]ccepting the premise that retroactive effect must be given to recognition, it must be acknowledged that on November 7, 1917, the date of the revolution, Soviet Russia became the obligor on Russia's

Treasury Notes.... That the Soviet Government so understood its obligations is implicit in the decree of repudiation made on January 21, 1918. There would have been no occasion for repudiation were there no obligation.

90 F.Supp. at 452. This contention is confirmed by the Litvinov Assignment itself, in which the Soviet Union assigned to the United States "the amounts admitted to be due or that may be found to be due *it, as the successor of prior Governments of Russia." Pink,* 315 U.S. at 212, 62 S.Ct. at 556 (emphasis added).

## *The Litvinov Assignment, Nationalization, and Retroactive Recognition*

As this Court observed *supra,* the Supreme Court recognized the validity of the Litvinov Assignment, as incidental to the President's power to recognize a foreign government, in *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), and again in *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed 796 (1942). These cases also settled important questions about the effect of recognition of the Soviet Union and about the extraterritorial effect of the various Soviet nationalization decrees. *Belmont* noted that the Assignment, the establishment of diplomatic relations, the recognition, and the exchange of ambassadors were all part of a single transaction: "The effect of this was to validate, so far as this country is concerned, all acts of the Soviet Government here involved from the commencement of its existence." That is, as the quote from *United States v. National City Bank supra* indicated, the United States' recognition of the Soviet Union was retroactive.

*Pink* built on *Belmont's* holding of retroactivity in determining the effect of the Soviet Union's nationalization decrees. The *Pink* Court was able to refer to an authoritative tribunal, the People's Commissariat for Justice of the R.S.F.S.R., which had declared in November 1937 at the United States' request that "all nationalized funds and property of former private enterprises and companies ... constitute the property of the State ... irrespective

of whether it was situated within the territorial limits of the R.S.F.S.R. or abroad." 315 U.S. at 219–20. The Court took this as a conclusive indication that the nationalization decrees were intended to have extraterritorial effect, and held that in virtue of the retroactive character of recognition it would recognize that effect. 315 U.S. at 234. Thus, under *Pink* title to Russian property in the United States vested in the United States, having passed to the Soviet Union by virtue of the nationalization decrees and thence to the United States by virtue of the Litvinov Assignment. *Id; see Steingut v. Guaranty Trust Co.,* 58 F.Supp. 623, 632 (S.D.N.Y.1944), *aff'd in part and modified in part,* 161 F.2d 571 (2d Cir.), *cert. dismissed sub nom. Guaranty Trust v. United States,* 332 U.S. 753, 68 S.Ct. 81, 92 L.Ed 339 (1947). This set the stage for the eighteen years of litigation during which the United States worked to collect on Litvinov Assignment claims.

If there had been no Litvinov Assignment the Soviet Union, following recognition, could have sued in the United States courts to collect its nationalized property in the United States. That is just what the United States did after it gained title to that property under the Assignment.

*The Setoff Cases as Involving Soviet Waivers of Immunity*

As observed *supra,* the typical fact pattern in a Litvinov Assignment case involved the United States suing a bank for a deposit whose title had passed to it from the Soviet Union as a result of the Litvinov Assignment; the bank would then claim a setoff against Russian debts, including notes, that it held. Cases that permitted such setoffs imply that in general the Soviet Union enjoyed sovereign immunity from suit on its repudiated debts, and that Litvinov Assignment cases presented a special exception, in that by suing, the sovereign (or its assignee) has waived immunity as to all claims arising out of the transaction sued upon. *Cf.* Fed.R.Civ.P. 13(a). As the court in *United States v. New York Trust Co.* put it,

The set-off which may be asserted against a sovereign, is in reality a claimed recoupment and is "in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's (the sovereign's) action is grounded." ... If [,however,] the claimed set-off to the suit by the sovereign is based "upon matter unrelated to the primary claim," it is "the equivalent of an independent suit against the sovereign, which, of course, may not be sued without its consent."

75 F.Supp. 583, 587 (S.D.N.Y.1946). *United States v. New York Trust* did not present such a fact pattern. In that case, the Soviet funds the United States was suing to recover were held by the bank in the name of a railway company that the Soviets had nationalized; they were completely unrelated to the Provisional Government treasury notes the bank held and tried to interpose by way of setoff.[8]

By contrast, a setoff was allowed in *State of Russia v. Bankers' Trust Co.,* 4 F.Supp. 417 (S.D.N.Y.1933), *aff'd sub nom. United States v. National City Bank,* 83 F.2d 236 (2d Cir.), *cert. denied,* 299 U.S. 563, 57 S.Ct. 25, 81 L.Ed. 414 (1936), a pre-Litvinov Assignment case, even though the district court recognized that the special fund sued on by the Kerensky Government was distinct from that Government's indebtedness to the bank.

Ultimately, the view of the district court in *Bankers' Trust* prevailed, when in *National City Bank v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955), the Supreme Court rejected the "same subject" limitation. The courts have since followed *National City Bank v. Republic of China* in holding that the equities require allowing a defendant to assert any defensive counterclaim against a foreign sovereign plaintiff to the amount, only, of the claim sued on. *See, e.g., Banco Nacional de Cuba v. Chemical Bank New York Trust Co.,* 594 F.Supp. 1553, 1559 (S.D.N.Y.1984) (discussing Justice Douglas's view that *National City Bank v. Re-*

---

**8.** As mentioned *infra, United States v. New York Trust* specifically held that the Soviet Union

possessed sovereign immunity from suit on those notes.

public of China controlled in *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 770, 92 S.Ct. 1808, 1814, 32 L.Ed.2d 466 (1972) (Douglas, J., concurring)), *aff'd sub nom. Banco Nacional de Cuba v. Chemical Bank,* 822 F.2d 230 (2d Cir.1987); *id.* 1566 n. 10 (commending practical wisdom of Justice Douglas's position).[9] Furthermore, the *National City Bank v. Republic of China* doctrine is now codified in the FSIA. 28 U.S.C. § 1607(c) (1986) (abrogating sovereign immunity for counterclaims "to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state"); *see Banco Nacional de Cuba v. Chemical Bank New York Trust Co.,* 594 F.Supp. at 1560 n. 8.[10]

The now-settled character of the *National City Bank v. Republic of China* doc-

trine should not obscure the fact that the doctrine applies only to setoffs. Even cases that allow setoffs implicitly recognize that the underlying equitable principle is that of the sovereign's limited waiver of immunity, effectuated by its suing in the United States courts. The cases allowing setoffs do not justify abrogating immunity in a case such as the present one, wherein plaintiffs are trying to hale the sovereign into court as an original matter.

*Soviet Repudiation of Foreign Debts*

Soviet repudiation of predecessor governments' foreign debts would appear to be simply the obverse of Soviet nationalization of predecessor governments' property located abroad. The United States courts were generally not so quick, however, to give effect to the Soviet decree repudiating foreign debts.[11] The retroactive character

**9.** In *First National City Bank v. Banco Nacional de Cuba,* the plurality declined to apply the Act of State doctrine to prohibit Citibank's assertion of a defensive counterclaim, in light of a State Department document it construed as having the effect of a Bernstein letter. Justice Douglas argued that reliance on this document was unnecessary in light of *National City Bank v. Republic of China,* which permitted assertion of such a counterclaim on a theory of waiver of sovereign immunity.

Justice Douglas's approach is even more appropriate in the present case. This case involves issues of sovereign immunity only and does not implicate the Act of State doctrine. Plaintiffs recognize this fact. Memorandum of Plaintiffs in Opposition to Motion of Union of Soviet Socialist Republics for Relief from Judgment by Default, and for Dismissal 33. The Act of State doctrine is, of course, related to the doctrine of sovereign immunity, but differs significantly from that doctrine. Sovereign immunity is jurisdictional, and is now codified in the FSIA. The Act of State doctrine, by contrast, "is a judicially created exception to the rule that courts of the United States will decide cases before them where their jurisdiction has been properly invoked." *Banco Nacional de Cuba v. Chemical Bank New York Trust,* 594 F.Supp. at 1557.

Because this case rests on issues of sovereign immunity alone, the entire line of Act of State expropriation cases beginning with *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), continuing through *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) and *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), and including this Court's own *Chemical Bank New York Trust, supra,* and *Banco Nacional de Cuba v.*

*Chase Manhattan Bank,* 505 F.Supp. 412 (S.D.N.Y.1980), *aff'd,* 658 F.2d 875 (2d Cir.1981), are inapposite, although of more than passing scholarly and historical interest.

**10.** It remains the case, however, that before *National City Bank v. Republic of China* the *Bankers' Trust* district court was the only court to permit a setoff on the basis of such equitable considerations. Indeed, the Second Circuit opinion in *National City Bank v. Republic of China* even declined, on grounds of judicial restraint, to apply the Tate Letter to permit defensive counterclaims while disapproving sovereign immunity in this context:

Assuming, *arguendo,* that [the Tate] letter could and should affect judicial decisions, we see nothing in it to justify the suggested extension [to permit assertion of counterclaims based on sovereigns' commercial transactions]. We have no high regard for the idea that, without its consent, a government may not be sued for acts which, if done by a private person, would be actionable wrongs. But we feel that we must leave to Congress or the Supreme Court any marked diminution of that hoary doctrine (although, in the belief of many persons, it is basically immoral).

*National City Bank v. Republic of China,* 208 F.2d 627, 630 (2d Cir.1953).

**11.** When the McGuire Memo concludes that "recognition of the Soviet Government by the United States Government validated the acts of the Soviet Government with respect to its decree ... concerning the annulment of State loans ... which repudiated the obligations to the United States and its nationals incurred by its predecessor governments," McGuire Memo at 4, what is meant is that the repudiation is recognized as

of recognition, moreover, created an anomaly. If, as explained *supra,* recognition of the Soviet Union is retroactive to the October Revolution, once the Soviet Union was recognized would not the Provisional Government's actions be retroactively nullified? The courts concluded that they were not. Indeed, two cases, *Guaranty Trust Co. v. United States* and *United States v. National City Bank,* can be read to imply that the Soviet repudiation was ineffective, precisely because recognition of the Soviet Union, though retroactive, did not entail nullification of the legal consequences of actions of the Provisional Government while it was recognized.

*Belmont* had held that "[t]he effect of [recognition] was to validate, so far as this country is concerned, all acts of the Soviet Government here involved from the commencement of its existence." 301 U.S. at 330, 57 S.Ct. at 760. "All acts," taken literally, includes the repudiation of foreign debts. Less than a year after *Belmont,* however, the Supreme Court retreated from this position, characterizing recognition instead as "an action which for *many* purposes validated here that government's previous acts *within its own territory,*" *Guaranty Trust Co. v. United States,* 304 U.S. 126, 140 58 S.Ct. 785, 792, 82 L.Ed. 1224 (1938) (emphasis supplied).

The precise question that concerned the *Guaranty Trust Co. v. United States* Court was whether Guaranty Trust's notice to representatives of the Provisional Government of repudiation of liability on that Government's deposit at Guaranty Trust was binding, after recognition, as notice to the Soviet Government, so as to preclude tolling the statute of limitations.

The consequence of holding that the notice was sufficient would be that the statute had run, and the United States, as assignee under the Litvinov Assignment, could not sue for the Provisional Government's credit.

In *Guaranty Trust Co. v. United States,* the Court rejected what it took to be the United States' contention that recognition "operates to set at naught all the legal consequences of the prior recognition by the United States of the Provisional Government and its representatives, as though such recognition had never been accorded." *Id.* The Government's position, in the Court's view, "is tantamount to saying that the judgments in suits maintained here by the diplomatic representatives of the Provisional Government, valid when rendered, became invalid upon recognition of the Soviet Government." *Id.* That is, recognition of the Soviet Government would nullify, retroactively, the legal consequences of Americans' transactions with the Provisional Government. The result, in the Court's view, would be international chaos:

> The very purpose of the recognition by our Government is that our nationals may be conclusively advised with what government they may safely carry on business transactions and who its representatives are. If those transactions, valid when entered into, were to be disregarded after the later recognition of a successor government, recognition would be but an idle ceremony, yielding none of the advantages of established diplomatic relations in enabling business transactions to proceed, and affording no protection to our nationals in carrying them on.

an act of the de jure government of the Russian State. The McGuire Memo did not mean to suggest that the repudiation should be recognized as releasing the Soviet Union from the obligations incurred by its predecessor governments. *See id.* (repudiation would justify espousal by United States of bondholder claims).

This Court observes that although the McGuire Memo concludes that the United States could justifiably espouse the claims of the bondholders against the Soviet Union, it does not

support plaintiffs' contention that the Soviet Union could have been sued on the bonds in the United States courts. The specific question the McGuire Memo addressed was whether claims on the bonds were compensable by the Foreign Claims Settlement Commission. *See id.* at 1. FCSC funds, as has been said, were collected under the Litvinov Assignment: thus, the McGuire Memo's reasoning, however cogent, cannot support the conclusion that the Soviet

304 U.S. at 140–41, 58 S.Ct. at 792–93.[12]

In holding that the notice was binding, the Court did not go far beyond holding that acts of predecessor governments bind successor governments. *Guaranty Trust Co. v. United States* did not address the question of the effect of Soviet repudiation of predecessor debts. It held only that recognition of the Soviet Government did not, in and of itself, nullify the legal effects of acts of the Provisional Government while it was recognized.

As far as this Court has been able to determine, the question of the effect of Soviet repudiation of foreign debts has never before arisen in a direct suit against the Soviet Union. Indeed, it seems to have been discussed at length in only one of the cases in which banks tried to interpose Russian debts as setoffs or counterclaims to United States suits on Litvinov Assignment property. *United States v. National City Bank*, 90 F.Supp. 448 (S.D.N.Y.1950), concluded on the basis of *Guaranty Trust Co. v. United States* that a setoff would be available. In this case, the United States sued the National City Bank of New York for the proceeds of an account originally belonging to the Russo-Asiatic Bank. The National City Bank was allowed to set off some $4 million in one-year 5% treasury notes issued in 1917 by the Provisional Russian Government and payable at the Bank. As in the other setoff cases discussed *supra,* this was the dispositive fact, for it made the notes "the equivalent of orders 'to the bank to pay the same for the account of the principal debtor thereon.'" 90 F.Supp. at 452, *quoting* former N.Y. Negotiable Instruments Law § 147.[13] The court held that repudiation did not prevent the Bank from executing such orders. "That order National City Bank could execute unless the act of repudiation prevented it. But if repudiation had such an ef-

fect, the set-off should have been disallowed in U.S. v. National City Bank [83 F.2d 236 (2d Cir.1936), discussed *supra* ]." 90 F.Supp. at 453 (footnote omitted).

The court then invoked *Guaranty Trust Co. v. United States* 's distinction between the territorial and extraterritorial effects of recognition. "The impact of repudiation by a sovereign within its own territory is governed by the law which prevails within that territory. But obligations created here and here performable are governed by local law." 90 F.Supp. at 453. It then drew what it took to be the consequences for Soviet immunity against setoff:

Repudiation by a foreign sovereign of obligations subject to our domestic law is effective only to the extent that its sovereign immunity shields it from suit. Wherever the shield of sovereign immunity is not available there is nothing to prevent our domestic law from taking its course. Here, if the set-off is appropriate, immunity is not available....

Nor can the repudiation be regarded as a revocation of the bank's authority to pay the Notes for the account of the obligor. As already indicated, some time after the Soviet Government had repudiated the Treasury Notes, our Government cooperated in securing from the holders an extension of maturity, on request of the then recognized representatives of the Russian State. Relevant is the language of [*Guaranty Trust,* 304 U.S. at 140, 58 S.Ct. at 792]: "The very purpose of the recognition by our government is that our nationals may be conclusively advised with what government they may safely carry on business transactions and who its representatives are." Were it held that the repudiation of 1918 must now be considered a part of our municipal law, or that the repudiation is operative as a revocation of the

---

Union did not enjoy sovereign immunity against suit on the bonds.

**12.** The *Guaranty Trust* Court thus supported the conclusion Justice Frankfurter would later call "fantastic," that actions of the Provisional Government could bind the Soviet Union up to a decade after the Provisional Government had ceased to govern. In fact, the Court cited the

district court decision in *Lehigh Valley* at this point.

**13.** As the subsequent discussion makes clear, the *United States v. National City Bank* court goes beyond earlier cases that suggested that a setoff was allowable only if it was related to the same transaction as the credit being sued upon.

banker's authority, so as to convert these domestic obligations into scraps of paper for all purposes, then the words "conclusively." and "safely" would have to be stricken from the Court's opinion.

Does the allowance of this set-off conflict with the national policy as expressed in the Litvinov Assignment? I think it does not; or at least no more so than allowing the set-off in U.S. v. National City Bank, supra, or in giving effect to the Statute of Limitations in Guaranty Trust Co. v. U.S., supra. The United States took Russia's claims subject to their infirmities.

90 F.Supp. at 453.

Thus, *United States v. National City Bank* permits the inference that the Soviet repudiation of foreign debt would not have been recognized if the question had ever arisen directly. It is crucial to note, however, that it did not and probably could not arise directly. The *United States v. National City Bank* court was concerned only with letting the Bank set off Russian debits against United States credits. No matter what its views on the Soviet repudiation, the court allowed the setoff on a theory of waiver of sovereign immunity effected by the United States, as assignee of the Soviet Union, appearing as a plaintiff. Otherwise, the court would not have needed to invoke the theory that it was in effect dealing merely with "mutual debts capable of being set off by a bank," 90 F.Supp. at 453. Although the *United States v. National City Bank* court may well have believed that Soviet repudiation was ineffective, any such implication in the language of that case is, on its facts, dictum.[14]

More importantly, even if such a suggestion were not dictum—if a United States court were to hold squarely that Soviet

repudiation was ineffective—that would show only that the Soviet Union owed valid obligations on debts incurred by its predecessor governments. That does not mean that the obligations are enforceable in the United States courts—that is, that the Soviet Union would not have been immune from suit on those obligations. Creditors of the Soviet Union would have a right without a remedy; but this would put them in the same position any creditor was in, with respect to a sovereign, before the Tate Letter.

Again, the Court has discovered only one decision that framed this issue in this way. That decision, *United States v. New York Trust Co.*, 75 F.Supp. 583 (S.D.N.Y.1946), was discussed *supra* as a leading example of "same transaction" analysis in evaluating counterclaims against Litvinov Assignment suits. The court reached the conclusion that counterclaims were only entertainable against the United States if they arose from the same transaction as the assets sued upon by considering what the result of a suit against the Soviet Union, assuming there had been no Litvinov Assignment, would have been. The court concluded that there could not have been such a suit because the Soviet Union enjoyed absolute immunity, even when it was not recognized:

Disregarding the Soviet Government's repudiation of the notes as obligations of a predecessor Russian Government, and the Soviet's annulment of such obligations by its decree of January 21, 1918, and assuming that the New York Trust Company had a valid legal claim against the Soviet Government based on these notes, nevertheless the Soviet's [sic] sovereign immunity would be a shield against the enforcement of the Trust

14. Not only was the *United States v. National City Bank* court's view about repudiation dictum, it was arrived at by a process so tortuous that Judge Rifkind himself commented:

It is, of course, painfully clear that ... I have traversed a bridge built of fictions. "Retroactivity" of Soviet recognition in 1933 commands us to treat the Russian decrees of 1917 *as if* the United States had recognized the Soviet Government on the day of the revolu-

tion. That fiction prevails until it collides with another, that the accredited agents of the Provisional Government must, at least in some respects, be treated *as if* there were a government whom they represented. Despite the cataclysmic character of the Bolshevik revolution, we must treat the Soviet Government as the uninterrupted extension of the empire of the Czars.

90 F.Supp. at 454.

Company's claim. Sovereign immunity is based on international law and it may be asserted even by an unrecognized government.

75 F.Supp. at 587. *See Restatement (Second) of Foreign Relations Law of the United States* § 107, comment d ("A claim of immunity as a foreign state may not be defeated by asserting that an entity that qualifies for recognition as a state ... is not recognized as such...."). *United States v. New York Trust Co.*, then, clearly indicates that as late as 1946 the United States courts regarded the Soviet Union as entitled to absolute immunity from claims arising from its repudiation of foreign debts. Thus, *Guaranty Trust Co. v. United States* and *United States v. National City Bank*, contrary to first appearance, lend no support to plaintiffs' position. What matters is not whether the United States courts would have given effect to the Soviet repudiation—as *United States v. National City Bank*, at least, implies it would—but whether the Soviet Union was regarded as immune from suit on the bonds no matter what the effect of the repudiation.

History provides us, then, with every indication that the Soviet Union would have had a justified expectation, before the publication of the Tate Letter, that it could not be sued in the United States courts on the bonds involved in this case. This Court concludes that that expectation rises to the level of an antecedent right that precludes constitutional retroactive application of the FSIA in this case.

*Prior Cases on Pre–1952 Application of the FSIA*

This Court must still address plaintiffs' contention that the FSIA must be applicable to pre–1952 commercial transactions, because other courts have so applied it. The short answer is that this contention is contrary to a binding decision of our Court of Appeals. In *Venezolana*, 629 F.2d at 790–91, our Court of Appeals held that the court below did not have FSIA jurisdiction over a case filed on April 9, 1976, almost a year before the FSIA took effect: "we cannot agree with the district court's view

that Congress intended such retroactivity [over cases pending on the effective date of the FSIA] in the case of the FSIA." *Id.* at 791. This Court finds that plaintiff is correct in contending, however, that *Venezolana* refers only to *cases* pending on the effective date of the FSIA, not to claims that accrued before that date. The Court has therefore reviewed all the cases that the parties have brought to its attention involving alleged retroactive application of the FSIA.

Two degrees of retroactivity are at issue here. The Soviet Union is willing to concede that the FSIA can apply to claims arising before its effective date, so long as those claims did not arise before the publication of the Tate Letter in 1952. On this view, it was the Tate Letter's adoption of the restrictive theory of sovereign immunity that *created* a cause of action that had never existed theretofore, against foreign sovereigns for their commercial acts. Plaintiffs maintain, to the contrary, that the plain language of the FSIA sets no limits on its applicability, so that it can apply retroactively to pre–1952 claims.

It is settled that a cause of action against foreign sovereigns for their commercial acts existed before the FSIA. As mentioned *supra*, it was on this basis that Judge Winter rejected the argument that passage of the FSIA tolled the statute of limitations for actions against foreign sovereigns. *Schmidt v. Polish People's Republic*, 742 F.2d 67, 71 (2d Cir.1984) ("[S]ince the "Tate Letter" of 1952 ... foreign sovereign immunity had not extended to the commercial activity of a foreign state."). *Accord Gilson v. Republic of Ireland*, 682 F.2d 1022, 1025 (D.C.Cir. 1982). We need not, however, reach the question whether the FSIA applies to claims that arose between 1952 and 1977, because the claims presently at issue arose well before 1952. Therefore, we are not concerned with cases that apply the FSIA to post–1952 claims, such as *Ohntrup v. Firearms Center, Inc.*, 516 F.Supp. 1281 (E.D.Pa.1981), *aff'd mem.*, 760 F.2d 259 (3d Cir.1985), or *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp.

622 (S.D.N.Y.1978) (Goettel, J.), *aff'd*, 597 F.2d 314 (2d Cir.1979).

The only cases relevant to the present inquiry are *Slade v. United States of Mexico*, 617 F.Supp. 351 (D.D.C.1985), *aff'd mem.*, 790 F.2d 163 (D.C.Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1360, 94 L.Ed.2d 531 (1987), and *Jackson v. People's Republic of China*, 596 F.Supp. 386 (N.D. Ala.1984), *aff'd*, 794 F.2d 1490 (11th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987), which rejected a contention that the FSIA is applicable retroactively to commercial transactions that took place in the early part of this century, and *Schmidt v. Polish People's Republic*, 579 F.Supp. 23 (S.D.N.Y.), *aff'd*, 742 F.2d 67 (1984), *Von Dardel v. Union of Soviet Socialist Republics*, 623 F.Supp. 246 (D.D.C.1985), and *Asociacion de Reclamantes v. United Mexican States*, 561 F.Supp. 1190 (D.D.C.1983), *aff'd*, 735 F.2d 1517 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1051, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985), the only three cases plaintiffs cite in which the operative events allegedly occurred before 1952.

This Court does not find *Schmidt, Von Dardel*, or *Reclamantes* to be persuasive authority. In *Schmidt*, the district court found that it had subject matter jurisdiction under the FSIA's commercial activity exceptions, noting that "FSIA gives the Court jurisdiction over any non-jury civil action against a foreign state as long as the defendant is not entitled to sovereign immunity." 579 F.Supp. at 26.[15] This is, to be sure, language congenial to plaintiffs. Judge Carter did not discuss the problem of FSIA retroactivity at all in *Schmidt*, however. He noted that actions against

foreign sovereigns were possible before the FSIA, but does not say whether they were possible before the Tate Letter. Judge Carter noted two events, however, that could have tolled the statute of limitations, by constituting acknowledgment of Poland's debt, so as to keep the *Schmidt* plaintiffs' claim alive past 1952: listings of the Polish Treasury notes at issue as state debts in 1946, which would have extended the limitations period until 1952, and a letter by a Polish plenipotentiary to an assistant United States Secretary of State expressing Poland's intention to negotiate directly with American bondholders which, if it were an acknowledgement, would have extended the limitations period to 1966. 516 F.Supp. at 29. Thus, the district court decision in *Schmidt* is not really a clear example of application of the FSIA to operative events before 1952. More importantly, the Court of Appeals's affirmance was assuredly not such an example. The Court of Appeals affirmed on statute of limitations grounds, without reaching Poland's cross-appeal on jurisdictional grounds.[16]

*Von Dardel* was an action against the Soviet Union for the seizure and detention of the heroic Swedish diplomat Raoul Wallenberg, whose singlehanded efforts saved the lives of nearly 100,000 Hungarian Jews at the close of the Second World War. As is well known, Raoul Wallenberg was arrested by Soviet occupation forces in Budapest in early 1945 and has not been heard from since. The Soviet Union, in a note to the Swedish Embassy by then Deputy Foreign Minister Andrei A. Gromyko, represented in 1957 that Wallenberg had died of natural causes in 1947. Persistent reports from former Soviet prisoners, however, in-

---

**15.** *Schmidt* was filed on January 16, 1984, almost a year after this Court entered the default against the Soviet Union, about six months after the Supreme Court decided *Verlinden*, and two years before we entered the default judgment in this case.

**16.** In its cross-appeal, Poland objected to personal jurisdiction, but because it did not dispute service, the ground of its objection could only have been lack of subject matter jurisdiction. In the district court Poland answered and asserted lack of subject matter jurisdiction, among other things, as an affirmative defense.

*Schmidt* illustrates the *Bell v. Hood* problem discussed *supra*. A dismissal of a claim as time barred is a dismissal for failure to state a cause of action, and thus is one on the merits. It could only have come after the court determined that it had subject matter jurisdiction. The present case differs from *Schmidt* in that this Court holds that there is no subject matter jurisdiction because none of the FSIA exceptions to sovereign immunity apply, for the reason that they could *not* apply before 1952.

dicated that Wallenberg was alive and in Soviet custody long after 1947, and may indeed be alive today. The *Von Dardel* court could not, on the record before it, make a finding about whether Wallenberg is still alive, but was able to characterize the Soviet Union's treatment of him as an "ongoing tort," 623 F.Supp. at 260. Thus, if Wallenberg is still alive, the Soviet Union's tortious conduct continues to this day; and if he is dead, because the *Von Dardel* plaintiffs are even now not in a position to know this fact through the exercise of reasonable diligence, under applicable statutes of limitation their claims have not yet accrued. Thus, whatever the circumstances, the *Von Dardel* plaintiffs have viable post–1952—indeed, post–1977—claims, so that *Von Dardel* does not involve retrospective application of the FSIA.

Finally, *Reclamantes* involved a class of land claimants allegedly deprived of their property at about the time the Republic of Texas was incorporated into the United States, in spite of the fact that the Treaty of Guadelupe Hidalgo, 9 Stat. 922, T.S. No. 207 (Feb. 2, 1848), which ended the Mexican-American War and effected that incorporation, specifically protected plaintiffs' claims. 561 F.Supp. at 1192; 735 F.2d at 1519. The Mexican Government, however, espoused those claims in the early 1920s; the ultimate result was the Treaty on Final Settlement of Certain Claims, 56 Stat. 1347, T.S. No. 980 (Nov. 19, 1941), under which Mexico assumed the obligation to compensate its own nationals for their land claims. Unfortunately, Mexico had done nothing to discharge this obligation in the forty years intervening before *Reclamantes* was filed. Nonetheless, Mexico had consistently acknowledged its obligation to pay plaintiffs' claims—as recently as January 29, 1982, after the suit was filed, *see* 561 F.Supp. 1195 (acknowledgement by Attorney General of Mexico); *id.* 1193 (filing of suit September 18, 1981)—so that even though the alleged deprivation of property occurred over 140 years ago, the plaintiffs in *Reclamantes* had a post–1952 claim, for compensation for that taking.

Thus, plaintiffs have not directed us to a case that genuinely involves pre–1952 ret-

roactive application of the FSIA. By contrast, the present case, *Jackson*, and *Slade* involve no operative events after 1952. This Court finds *Jackson*, in particular, so similar to the instant case as to be dispositive. Indeed, at oral argument plaintiffs' counsel conceded that if *Jackson* was rightly decided it is dispositive against the present plaintiffs.

Like the present case, *Jackson* involved defaulted bonds issued long ago by a defunct Imperial Government—in *Jackson*, forty-year bonds issued in 1911 to help finance the building of the Huguang Railway. Soon afterward, the Imperial Chinese Government ceased to exist as a result of the Revolution of 1911; its successor, the Republic of China, made interest payments until the mid–1930s. The district court at first entered a default when the Republic's successor, the People's Republic of China, failed to appear. As in the present case, representatives of the State Department then explained the United States' adoption of restrictive immunity and the FSIA, and persuaded the People's Republic to enter a special appearance. The district court then vacated the default to consider whether it had subject matter jurisdiction, and finding that it did not because the FSIA does not apply to pre–1952 transactions, dismissed the complaint. The Eleventh Circuit affirmed, using reasoning virtually identical to that offered here.

This Court cannot discern such difference between the present case and *Jackson* sufficient to allow us to distinguish *Jackson*. Persuaded by the reasoning of that case and by all the other considerations advanced herein, we hold that the default judgments previously entered in these cases are void for want of jurisdiction under Fed.R.Civ.P. 60(b)(4), and accordingly dismiss the Complaints without prejudice and without costs.

The Clerk shall enter new judgments. So Ordered.